Mark D. Selwyn (SBN 244180)
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA  94306
Telephone:      (650) 858-6031
Facsimile:      (650) 858-6100

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| UNITED FARM WORKERS and UFW FOUNDATION, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| THE UNITED STATES DEPARTMENT OF LABOR and EUGENE SCALIA, in his official capacity as United States Secretary of Labor, | |
| Defendants. | |

Plaintiffs United Farm Workers (UFW) and UFW Foundation for their Complaint against Defendants United States Department of Labor (DOL) and Eugene Scalia, in his official capacity as United States Secretary of Labor, hereby allege as follows:

## INTRODUCTION

1.     The United States critically depends on approximately two to three million farmworkers located in rural communities from coast to coast to produce the nation's food supply and contribute to the economy through agricultural exports.  Although they are essential to the continuity of the American food supply, these farmworkers are vulnerable to wage decline, job loss, or other economic dislocation.  Their jobs typically offer only subsistence wages, are often seasonal, and are vulnerable to fluctuations in the economy.  Farmworkers are finding it even more difficult to earn a livable wage—and to afford basic needs such as shelter and food—because many are unemployed or underemployed due to the COVID-19 pandemic.

2.     In creating the H-2A temporary foreign agricultural worker program, Congress charged Defendant U.S. Department of Labor (DOL) with ensuring the economic security of U.S. farmworkers.[1]  While federal law permits the entry of foreign agricultural guestworkers in unlimited numbers to supplement the U.S. labor supply, DOL is statutorily mandated to protect U.S. farmworkers' jobs and wages from the potentially adverse economic consequences posed by low-cost, foreign labor.  Accordingly, before U.S. employers can hire foreign labor under the H-2A foreign guestworker visa program, DOL must certify that the hiring of those foreign guestworkers "will not adversely affect the wages and working conditions of workers in the United States similarly employed."

3.     With respect to wages, DOL primarily fulfills that statutory mandate by establishing for each state an Adverse Effect Wage Rate (AEWR)—a minimum wage that employers using the H-2A program must pay to both U.S. farmworkers and foreign guestworkers.  Since the H-2A program's inception in 1986 (except for a brief two-year period starting in 2008), DOL has relied exclusively on data from the Farm Labor Survey (FLS) to establish AEWRs.  DOL has repeatedly acknowledged that

---

[1] *See* 8 U.S.C. § 1101; *see also* 29 U.S.C. §§ 1801-1872 (Migrant and Seasonal Agricultural Worker Protection Act).

COMPLAINT

the FLS is its preferred data source because it is "the *only comprehensive survey* of wages paid by farmers and ranchers."[2]  The fact that the FLS "actually uses information sourced directly from farmers" "is a strong advantage of the FLS as the AEWR data source compared to all other alternatives."[3]  Those data allow DOL to establish AEWRs at market rates that reflect what farmworkers are actually paid, which protects wages paid to U.S. farmworkers from being depressed or stagnating due to the presence of foreign guestworkers willing to work for less.

4.     On November 5, 2020, DOL published a Final Rule in the Federal Register announcing changes to its methodology for setting AEWRs under the H-2A program.  Ignoring or disregarding its own pronouncements that H-2A wages must be closely linked with actual market wages paid to farmworkers to protect against adverse effects, the Final Rule untethers the AEWR from any measure of market wages.  First, the rule freezes AEWRs based on 2019 FLS data for two years—meaning that farmworkers' wages will not increase by even the rate of inflation, let alone the higher rates at which farmworkers' wages have been rising for the last several years.  Second, the rule announces that starting in 2023, DOL will begin adjusting those frozen AEWRs (still based on FLS wage data from 2019) annually, using the Employment Cost Index (ECI).  The ECI measures the change in the cost of labor by surveying various private industry sectors *but not* the agricultural sector.  DOL explained that the recent ECI data showed a significantly slower rate of wage increases than recent measures of trends in agricultural worker wages.  As a result, like the wage freeze arbitrarily keeping 2019 rates in place until 2023, the planned future AEWR adjustments are not based on actual conditions in the agricultural labor market.  By contrast, the Final Rule creates more refined, market-based annual AEWRs for a small set of "higher-skilled" agricultural jobs using the Occupational Employment Statistics (OES) survey conducted by the Bureau of Labor Statistics (BLS).  DOL explains that the shift to OES data for that subset of jobs is necessary to ensure that

---

[2] *Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A Nonimmigrants in Non-Range Occupations in the United States*, 85 Fed. Reg. 70,445, 70,467 (Nov. 5, 2020) (emphasis added); *see also id.* at 70,468 ("[T]he FLS has been the only comprehensive survey of wages paid by farmers and ranchers that has enabled the Department to establish hourly rates of pay for H–2A opportunities.").
[3] *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010).

AEWRs accurately reflect actual market wages, which is necessary to protect U.S. farmworkers from adverse effects.

5. The Final Rule—which becomes effective on December 21, 2020—is unlawful and must be set aside under the Administrative Procedure Act (APA).

6. First, the Final Rule contravenes DOL's statutory mandate because it fails to protect U.S. farmworkers from the adverse effects caused by wage stagnation or depression due to an influx of foreign guestworkers. As DOL recognizes, H-2A wages must reflect market rates to protect against wage stagnation or depression. The Final Rule disregards that principle. Instead, it purposefully causes farmworker wages to stagnate by imposing a two-year wage freeze, and it later applies adjustments that will produce lower wages, unrelated to market conditions.

7. Second, the Final Rule is arbitrary and capricious. DOL fails to provide a cogent rationale for freezing the wage rates for two years and the other rule changes, instead offering contradictory and inconsistent justifications. DOL also fails to consider or arbitrarily rejects obvious alternatives that would better protect U.S. farmworkers. And even though DOL acknowledges that severing the link between H-2A wages and agricultural labor markets will cause U.S. farmworkers to be paid substantially less, it has failed to analyze or adequately consider the extent and impact of that harm.

8. Third, DOL failed to comply with the APA's notice-and-comment requirements. Although DOL issued a Notice of Proposed Rulemaking in July 2019, the Final Rule is not a logical outgrowth of the initial proposal. In light of the fundamental differences between the rules proposed in July 2019 and the Final Rule, and the significant changes to assumptions that underlie the July 2019 proposed rule, DOL was required to provide additional notice and comment before issuing the Final Rule. Its failure to do so renders the rule unlawful.

9. DOL's new AEWR methodology will cause several hundreds of thousands of farmworkers already living on subsistence incomes to be paid significantly less than they otherwise would. The two-year wage freeze will cause workers to be paid more than 4% less on average than they would under DOL's current regulations. In certain states, like California, Oregon, and Washington, those losses would be substantially greater. California farmworkers will be paid

almost $1 less per hour under the Final Rule compared to the current methodology, resulting in approximately $170 in lost wages per month.[4]   Oregon and Washington farmworkers would likewise be paid about $0.45 less per hour, resulting in approximately $77 in lost wages per month.[5] Moreover, starting in 2023 (after already losing two-years' worth of wage increases), farmworkers wages will increase slower than the market rate.  In short, farmworkers will be paid substantially less under the Final Rule.  Indeed, DOL itself estimated that the methodological change would transfer more than $1.6 billion in wages from H-2A farmworkers to agricultural employers over the next ten years, with average losses to these foreign guestworkers totaling $167.76 million per year.[6] But this significantly underestimates the harm to farmworkers overall, as DOL declined to estimate the costs of either lost wages or lost employment to U.S. farmworkers.  Both U.S. farmworkers and foreign guestworkers will therefore be irreparably harmed by the Final Rule's drastic reduction of their wages.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over this action for review of final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and 28 U.S.C. §§ 2201-2202 (declaratory and further relief).

11.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are an agency of the United States and an officer acting in his official capacity, no real property is involved in this action, plaintiff UFW resides in the District, and the challenged regulations impact tens of thousands of farmworkers in the District.

## INTRADISTRICT ASSIGNMENT

12.     This action involves legal challenges to agency action that adversely affects Plaintiff UFW, which has its headquarters in Kern County, and thousands of farmworkers living and working in Kern County and elsewhere in the Fresno Division.  Assignment of this case to the Fresno

---

[4] *See infra* ¶ 92.
[5] *See infra* ¶ 93.
[6] *See* 85 Fed. Reg. at 70,472.

Division is therefore proper under Civil L.R. 120(d), because a significant portion of the impacted farmworkers live or work in or adjacent to counties within that division.

**PARTIES**

13.     Plaintiff United Farm Workers is the nation's first successful and largest farmworkers' union with a total membership of over 45,000 members across the nation, including farmworkers, both U.S. and foreign, employed at employers that participate in the H-2A temporary foreign worker program.   UFW is headquartered in Keene, California, and maintains offices in Oregon and Washington State, and it has a substantial membership in numerous other states, including in Idaho, Arizona, and New Mexico.   UFW's mission is to support the rights and interests of farmworkers, including advocating for wages and workplace safety, and to provide farmworkers with the tools that they need to succeed.   UFW provides services and information to hundreds of thousands more farmworkers through social media efforts and a text membership program that reaches farmworkers in over thirty states throughout the United States, and through partnerships with La Campesina radio network and a network of organizations that provide services to farmworkers, including the UFW Foundation, Cesar E. Chavez Foundation, La Union del Pueblo Entero, and the National Farmworker Service Center.   UFW and its members are particularly interested in farmworker wages. UFW's members have relied on and benefitted from the yearly AEWR wage standards that operated as a floor protecting UFW-member farmworkers who work for H-2A program employers. Suspension of the FLS and the consequent impairment of the AEWR standard would therefore result in substantial decreases to UFW members' wages.   UFW brings this action on behalf of its members and farmworkers who rely on those AEWR wages and would suffer substantial harm because of DOL's rule.

14.     Plaintiff UFW Foundation, a sister organization to UFW, is a dynamic non-profit organization established in 2006 with the core purpose of empowering communities to ensure human dignity.   The UFW Foundation has staff serving farmworkers and low-income immigrants in California, Arizona, Washington, Oregon, and Michigan.   It serves over 100,000 farmworkers across the United States.   Through worker engagement and legislative advocacy, the UFW Foundation seeks to advance the rights of farmworkers.   In 2019, the UFW Foundation served over

5

100,000 farmworkers and low-income community members in California and Arizona.  More recently, the UFW Foundation has distributed emergency relief to farmworkers during the pandemic.  As of November 2020, more than $11 million in financial assistance has been provided to 22,278 farmworkers in California, Oregon, and Washington.  The UFW Foundation also helped to distribute 189,000 meals and over 46,179 food boxes to California farmworkers in 2020.  The UFW Foundation's work and members are directly impacted by increased poverty among farmworkers; as such, the UFW Foundation, its members, and farmworkers across the United States will be harmed by USDA's action.  The UFW Foundation has also coordinated the distribution of over 749,815 masks in rural farmworker communities in California, Oregon, Washington, and Michigan since March 2020.  In 2019, the UFW Foundation led a campaign to submit over 80,000 public and farmworker comments regarding the DOL's proposed rule to enact a series of regulatory changes to the H-2A foreign guestworker visa program.  At the federal level, the UFW Foundation and its farmworker members have educated legislators about the need for basic labor protections for both H-2A guestworkers and U.S. farmworkers.  The UFW Foundation brings this action on behalf of itself and its members and farmworkers who have benefited and will benefit from the services it provides, and who would be harmed by DOL's rule.

15.   Defendant United States Department of Labor is a federal agency of the United States. It is responsible for setting minimum wages under the H-2A foreign guestworker visa program and certifying that employers are permitted to hire foreign guestworkers under that program.

16.   Defendant Eugene Scalia is the United States Secretary of Labor.  The Secretary is ultimately responsible for all functions of the United States Department of Labor, including setting minimum wages under the H-2A foreign guestworker visa program and certifying that employers are permitted to hire foreign guestworkers under that program.  He is sued in his official capacity.

## FACTS

### A.   History and Purpose of the H-2A Program

17.   The H-2A agricultural guestworker program permits agricultural employers to hire foreign workers to perform agricultural work on a temporary basis under certain circumstances.  The modern-day H-2A program traces back to 1952, when Congress passed the INA.  The 1952 program

COMPLAINT

authorized the use of temporary foreign labor but did not distinguish between agricultural and non-agricultural workers.   The H-2 program was available to employers for agriculture and non-agriculture jobs until 1986, when the Immigration Reform and Control Act of 1986 (IRCA), P.L. 99-603, § 301, 100 Stat. 3359 (1986), amended the INA by establishing a separate H-2A visa classification for agricultural workers and H-2B for non-agricultural temporary foreign workers.

18.    The 1986 revisions to the foreign guestworker program were motivated by Congress's desire to ameliorate the various problems experienced under the Bracero program, the most significant of which was the "inadequacy of ... protections for farmworkers."[7]   As explained at the time, Congress "was ever mindful of the reports of abuses that occurred during the old Bracero program and had no intention of creating an environment conducive to the violation of worker rights."[8]   The protections afforded to U.S. and foreign guest workers under the H-2A program are thus informed by, and should be considered in the context of, the abuses that occurred during the Bracero program.

19.    The Bracero program was an agricultural labor agreement intended to increase the number of available farmworkers in the United States during the World War II worker shortage by authorizing the entry of Mexican nationals for temporary farm work.   Formally known as the Mexican Farm Labor Program, the Bracero program was created in 1942 through a bilateral agreement between the United States and Mexico and was later approved by Congress in 1943.[9] The program was expanded by Congress in 1951 and remained in effect until 1964.[10]

20.    While the Bracero program was in effect, it "was the chief source of foreign labor in the United States."[11]   Although the United States benefitted from this cheap source of labor,

---

[7] H.R. Rep. 99-682, at 80 (1986); *see also Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States*, 52 Fed. Reg. 20,496 (June 1, 1987).

[8] H.R. Rep. 99-682, at 83 (citation omitted).

[9] *See* Adam B. Cox & Cristina M. Rodriguez, *The President and Immigration Law*, 119 Yale L.J. 458, 487-488 (Dec. 2009).

[10] *Id.* at 489-490.

[11] Robert C. McElroy & Earle E. Garett, USDA Econ. Research Serv., *Termination of the Bracero Program: Some Effects on Farm Labor and Migrant Housing Needs*, Agric. Econ. Report No. 77 (June 17, 1965).

Congress acknowledged that "[t]he Bracero program has been likened by some to indentured slavery where employer exploitation was rampant and inhumane."[12]  Some of the major problems under the Bracero program included underpayment, dangerous working conditions, unhealthy living conditions, and threats of deportation by employers.

21.    On paper, the Bracero program mandated that employment contracts between the Mexican workers and their employers meet certain standards concerning wages and working conditions.  However, these protections were illusory in practice.  Contracts were written only in English, which Bracero workers generally did not understand, and many contract terms were not enforced.

22.    Beyond the substandard working and living conditions experienced by Mexican Bracero workers, the program also caused the wages paid to U.S. workers in the agriculture and railroad sectors to decline sharply, despite the inclusion in the Bracero program of mechanisms designed to prevent adverse wage effects on U.S. workers.[13]

23.    Outrage over the inhumane treatment of Bracero workers and the program's downward pressure on wages led Congress to end the program in 1964.  When enacting the modern H-2A program, Congress was well aware of the past abuses of the Bracero program.  Congress sought to avoid "creating an environment conducive to the violation of worker rights."[14]

**B.    Farmworkers Depend On The Protections Afforded By H-2A Wages**

24.    Estimates of the number of total farmworkers currently in the United States range between two to three million.  Over 200,000 of these workers are H-2A foreign guestworkers, meaning agricultural workers who permanently reside outside the United States but come to the United States on nonimmigrant visas to work at a particular job for up to ten months.[15]  These H-

---

[12] H.R. Rep. 99-682, at 83.

[13] *See, e.g.*, Cong. Research Serv., *The Effects on U.S. Farm Workers of an Agricultural Guest Worker Program* 4-5 (Dec. 28, 2009), https://www.everycrsreport.com/files/20091228_95-712_73170955c498ebe8f448919eff18c83e240c67e2.pdf.

[14] H.R. Rep. 99-682, at 83.

[15] Daniel Costa & Phillip Martin, *Coronavirus and Farmworkers: Farm Employment, Safety Issues, and the H-2A Guestworker Program*, Econ. Policy Inst. (Mar. 24, 2020), https://www.epi.org/publication/coronavirus-and-farmworkers-h-2a/.

2A workers were employed in 2019 by approximately 13,000 agricultural employers in the United States.

25. Farmworkers tend to be an impoverished group in the United States, with families earning on average $20,000 to $24,999 annually,[16] well below the federal poverty line of $26,200 for a family of four.[17] In contrast, the median household income of U.S. families is over $63,000.[18] Nearly half of farmworkers lack a high school diploma, whereas more than 90 percent of the overall U.S. working population graduated high school.[19]

26. Even among this farmworker population, H-2A workers are particularly vulnerable. They generally have little or no ability to speak or understand English and have limited education. Moreover, H-2A workers are recruited almost exclusively from countries where their earning potential is substantially less than what is offered to farmworkers in the United States. As a result of this wage imbalance between the United States and the home countries of guestworkers, even very low wages in the United States can be attractive to H-2A workers. Mexican farmworkers working in their home country, for example, only earn between about 11% to 13% of what the average U.S. farmworker earns.[20]

27. Because of the conditions described above, most H-2A workers are desperate for work in the United States to support their families. As a result, they are more likely to accept low wages than their U.S. counterparts. There is also an understanding among H-2A workers that complaining about unfair labor practices may lead not only to losing their current jobs but also to being

---

[16] DOL, *Findings from the National Agricultural Workers Survey (NAWS) 2015-2016: A Demographic and Employment Profile of United States Farmworkers* (Jan. 2018), https://www.dol.gov/sites/dolgov/files/OASP/legacy/files/NAWS-Research-Report-13.pdf.
[17] U.S. Dep't of Health & Human Servs., *Federal Poverty Level*, https://www.healthcare.gov/glossary/federal-poverty-level-fpl/.
[18] Semega et al., U.S. Census Bureau, *Income and Poverty in the United States: 2018* (June 2020), https://www.census.gov/content/dam/Census/library/publications/2019/demo/p60-266.pdf.
[19] USDA Econ. Research Serv., *Farm Labor* (Apr. 22, 2020), https://www.ers.usda.gov/topics/farm-economy/farm-labor/.
[20] *Workers on Mexico's Export Farms*, Rural Migration News (Nov. 19, 2019), https://migration.ucdavis.edu/rmn/blog/post/?id=2367.

1  "blacklisted" from future participation in the H-2A program, threatening not only their current

2  earnings but their families' future economic survival.

3      28.    The structure of the H-2A program also renders H-2A workers vulnerable to economic

4  exploitation, including low wages.  When an H-2A worker receives an H-2A visa, that visa is

5  specific to the petitioning employer, meaning that the worker is authorized to work for that employer

6  only.  The worker is thus wholly dependent on that employer for his visa.  If the worker leaves this

7  employer, he is obligated by the terms of his visa to immediately leave the United States and cannot

8  seek other work before leaving.  H-2A workers therefore lack the fundamental economic freedom

9  of U.S. workers—they are not permitted to sell their labor on the open market to the employers who

10  will pay them the best wages and provide safe working conditions.  And if an H-2A worker wants

11  to return to the United States to work during subsequent farming seasons, the worker is again

12  dependent on an employer to sponsor the worker for a visa.  Since employers can effectively force

13  H-2A workers to leave the United States and prevent or make it more difficult for them to return in

14  following years, those workers have little recourse if they wish to seek better pay.

15      29.    U.S. farmworkers' already impoverished economic condition, combined with the

16  power imbalance that compels foreign guestworkers to work for lower wages, demonstrates the

17  importance of the H-2A program's wage protections.  Without a meaningful wage floor, U.S.

18  employers would be able to hire foreign guestworkers at rates well below those paid to U.S.

19  farmworkers.  That downward pressure on wages would have a drastic impact on U.S. farmworkers'

20  ability to earn a sustainable wage.

21      30.    Employers' use of the H-2A program has increased significantly over the last several

22  years based on claims of labor shortages.  In fiscal year 2020, for example, DOL authorized

23  employers to hire 275,430 foreign guestworkers.[21]  That number represents a dramatic increase from

24  previous years.  For instance, employers obtained approval to hire only 162,720 foreign

25

26

27

28  [21] DOL Office of Foreign Labor Certification, *H-2A Disclosure Data FY2020*,
    https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2A_Disclosure_Data_FY2020.xlsx.

COMPLAINT

guestworkers in fiscal year 2015.[22]  Given that trend, the substantial use of the H-2A program will likely continue in 2021 and beyond.

31.     Unsurprisingly, those growing labor demands and the tight agricultural labor market have resulted in steadily increasing farmworker wages.  FLS data reflects that national farmworker wages have increased by over 4% per year since 2015.[23]  Wages have increased by greater amounts in states with a substantial number of H-2A workers.[24]  By comparison, wages in the overall U.S. economy have increased by an average of only 2.48% between 2015 and 2019.[25]

C.     **The Immigration and Nationality Act Mandates That DOL Prevent The Hiring Of H-2A Guestworkers From Adversely Affecting The Wages Paid To U.S. Farmworkers**

32.     The H-2A program is rooted in the Immigration and Nationality Act of 1952 (INA), which created a broad class of temporary, non-immigrant "H" visas for temporary admission of foreign workers to provide temporary or seasonal labor in sectors of the economy where there are

---

[22] DOL Office of Foreign Labor Certification, *H-2A Disclosure Data FY2015*, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2A_Disclosure_Data_FY15_Q4.xlsx.

[23] *See* USDA, *Farm Labor Report* 1 (Nov. 21, 2019), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/c821h164m/fq9788943/fmla1119.pdf ("The 2019 annual average combined gross wage for field and livestock workers was $13.99, up 6 percent from the 2018 annual average of $13.25 per hour."); USDA, *Farm Labor Report* (Nov. 15, 2018), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/9g54xm59d/j96024106/fmla1118.pdf ("The 2018 annual average combined wage for field and livestock workers was $13.25, up 6 percent from the 2017 annual average of $12.47 per hour."); USDA, *Farm Labor Report* (Nov. 16, 2017), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/m613n0170/db78td76w/FarmLabo-11-16-2017.pdf ("The 2017 annual average combined wage for field and livestock workers was $12.47, up 2 percent from the 2016 annual average of $12.20 per hour."); USDA, *Farm Labor Report* (Nov. 17, 2016), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/gh93h108v/c534fq60m/FarmLabo-11-17-2016.pdf ("The 2016 annual average combined wage for field and livestock workers was $12.20, up 4 percent from the 2015 annual average of $11.74 per hour."); USDA, *Farm Labor Report* (Nov. 19, 2015), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/pg15bg444/9w0324494/FarmLabo-11-19-2015.pdf ("The 2015 U.S. annual average combined wage for field and livestock workers was $11.74, up 4 percent from the 2014 annual average of $11.29 per hour.").

[24] *See, e.g.*, DOL, *AEWR Trends*, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/2c.%20AEWR%20TRends%20in%20PDF_12.16.19.pdf (showing recent wage increases of 4.2%, 5.2%, 5.3%, 6.1% in Florida, Georgia, Washington, and California, the states with the most H-2A jobs in FY2019).

[25] BLS, *Employment Cost Index: Historical Listing* 3 (Oct. 2020), https://www.bls.gov/web/eci/ecicois.pdf.

shortages of U.S. workers.[26]  More than three decades later, IRCA amended the INA to establish the separate H-2A visa classification for agricultural labor.[27]  As amended, the INA prohibits the Department of Homeland Security from issuing an H-2A visa unless the employer seeking to import foreign guestworkers has applied for and received a certification from DOL that:  (a) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition," and (b) the foreign workers' temporary employment "will not adversely affect the wages and working conditions of workers in the United States similarly employed."[28]

33.    Thus, while the INA allows employers to import foreign guest workers in response to U.S. worker shortages, the INA's manifest purpose is to protect U.S. workers from the potential adverse effects caused by an influx of guestworkers.[29]  The first prong of this certification standard—which reflects a congressional policy of preferring the employment of domestic farmworkers—protects U.S. workers by prohibiting agricultural employers from importing foreign guestworkers unless they have shown that the U.S. labor market cannot supply the required workers. And the second prong requires that this supplemental, foreign labor supply not harm U.S. farmworkers' wages and working conditions.  The two prongs are intertwined because shortages of U.S. workers could result if the offered wages and working conditions are so inadequate that U.S. workers are deterred from applying for those jobs, and employers would not need to improve those wages and working conditions (thereby increasing the domestic labor supply) because they are acceptable to vulnerable foreign farmworkers.

**D.    DOL's New Rule Fails To Protect U.S. Farmworkers From The Adverse Effects Of Hiring Foreign Guestworkers Or Offer A Cogent Rationale For The New H-2A Wage Methodology**

34.    As discussed, employers are only authorized to hire foreign guestworkers under the H-2A program if DOL certifies that the foreign workers' temporary employment "will not adversely

---

[26] *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).
[27] *See* P.L. 99-603, Title III, 100 Stat. 3359 (Nov. 6, 1986).
[28] 8 U.S.C. § 1188(a).
[29] *See, e.g.*, *Va. Agric. Growers Ass'n, Inc. v. U.S. Dep't of Labor*, 756 F.2d 1025, 1028-1031 (4th Cir. 1985); *Elton Orchards v. Brennan*, 508 F.2d 493, 500 (1st Cir. 1974).

affect the wages and working conditions of workers in the United States similarly employed."[30]
DOL has recognized, as a general matter, that the introduction of foreign guest workers makes wage
stagnation or depression likely to occur.[31]

35.     To avoid those adverse effects to U.S. farmworkers' wages, DOL regulations require
that employers utilizing the H-2A program pay a wage that is the highest of (i) the Adverse Effect
Wage Rate (AEWR), (ii) the prevailing wage rate, (iii) an agreed-upon collective bargaining wage,
or (iv) the federal or state minimum wage.[32]

36.     Under those regulations, DOL relies primarily on a two-pronged approach based on
the AEWR and prevailing wage rate to guard against wage depression that would otherwise result
from the hiring of large numbers of foreign agricultural workers.[33]  The prevailing wage rate protects
local wages paid for particular jobs, while the AEWR sets a state-wide wage floor to prevent wage
disparities over larger areas.   The AEWR, however, is the primary wage rate under the H-2A
program because it is higher than the other minimum wages in most circumstances.[34]  As a result,
the AEWR determines the wages of approximately 92% of the farmworkers at H-2A program
employers.[35]

37.     DOL's regulations have required it to use the FLS to calculate the AEWR for the H-
2A program since the program's inception in 1986 (except for a brief two-year period starting in
2008), and DOL used FLS data for the H-2A's predecessor program since 1953.[36]  Because of

---

[30] 8 U.S.C. § 1188(a).
[31] *See Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg.
6884, 6892 (Feb. 12, 2010); *Temporary Agricultural Employment of H-2A Aliens in the United
States*, 74 Fed. Reg. 45,906, 45,911 (Sept. 4, 2009).
[32] *See* 20 C.F.R. 655.120(a).
[33] *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the
United States; Adverse Effect Wage Rate Methodology*, 54 Fed. Reg. 28,037, 28,040, 28,045 (July
5, 1989).
[34] *See Temporary Agricultural Employment of H-2A Nonimmigrants in the United States*, 84 Fed.
Reg. 36,168, 36,179 (July 26, 2019).  In addition, in many areas, local prevailing wage surveys are
not conducted, so the prevailing wage rates referenced in DOL's minimum wage regulation do not
exist.
[35] *See id.*
[36] *See* 54 Fed. Reg. at 28,039-28,040.

13

DOL's longstanding reliance on the survey, USDA conducts the FLS in cooperation with DOL,[37] and DOL has funded the FLS since July 2011 pursuant to a memorandum of understanding between the agencies.[38]

> **1.     DOL's Operable H-2A Wage Regulations Rely On FLS Data To Establish AEWRs Each Year And Protect U.S. Farmworkers**

38.     DOL's current regulations governing H-2A wages and establishing the methodology for calculating AEWRs were adopted in 2010 and are largely consistent with the regulations that were effective until 2008.[39]  Under DOL's current rules, it sets an AEWR for each state or multi-state region using "[t]he annual weighted average hourly wage for field and livestock workers (combined) … as published annually by the U.S. Department of Agriculture … based on its quarterly wage survey," the FLS.[40]

39.     The 2010 Rule explained that the AEWR seeks to approximate the market wages that would exist absent an influx of foreign workers, thus "put[ting] incumbent farm workers in the position they would have been in but for the H-2A program."[41]  DOL elucidated that the AEWR was premised on the idea that "an increase of workers under the H-2A program" would prevent wages from "increas[ing] by an amount sufficient to attract more [U.S.] workers until supply and demand were met in equilibrium."[42]  In other words, "the AEWR avoids adverse effects on currently employed workers by preventing wages from stagnating at the local prevailing wage rate when they would have otherwise risen to a higher equilibrium level over time."[43]  DOL recognized that without the protections afforded by AEWRs set at regional or state-wide market rates, farmworkers "would

---

[37] USDA NASS, *Farm Labor: About the Survey*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Nov. 30, 2020).
[38] *See* 84 Fed. Reg. at 36,178; USDA NASS, *2020 Guide to Products and Services* 11 (Nov. 2019), https://www.nass.usda.gov/Publications/catalog.pdf.
[39] *See Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884 (Feb. 12, 2010).
[40] 20 C.F.R. § 655.103(b).
[41] 75 Fed. Reg. at 6891-6892.
[42] *Id.* at 6891.
[43] *Id.* at 6891-6892.

be adversely affected by lowered wages as a result of an influx of temporary foreign farm workers."[44]

40.    The 2010 Rule also concluded that the FLS was the best available data source for establishing AEWRs.  DOL explained that "[t]he FLS is the only annually available data source that actually uses information sourced directly from [farm employers]," which "is a strong advantage of the FLS as the AEWR data source compared to all other alternatives."[45] Additionally, the FLS's "broader geographic scope makes the FLS more consistent with both the nature of agricultural employment and the statutory intent of the H–2A program."[46]  In short, FLS data was best suited to protect against adverse effects because it allowed DOL to establish AEWRs at regional market rates.  Conversely, DOL recognized that using data other than the FLS to calculate AEWRs (in that case, OES survey data) "entails a significant risk that U.S. workers may in the future experience wage depression as a result of unchecked expansion of the demand for foreign workers."[47]

41.    DOL found that commenters' "concerns that the FLS produces an artificially high wage rate" were "unfounded."[48]  Instead, DOL recognized that market rates offered to farmworkers likely *understate* the wages that farmworkers would be paid if the market were more efficient.[49]  Stated simply, DOL found that farmworkers would likely be paid more than current market wages if farmworkers were not "disadvantaged in terms of access to information about

---

[44] *Id.* at 6891; *see also id.* at 6895 (concluding that "[a]ccess to an unlimited number of foreign workers in a particular labor market at the current prevailing wage would inevitably keep the prevailing wage lower than it would have been had it adjusted to an equilibrium wage to dispel the shortage through normal market processes involving domestic labor supply flows in response to equilibrium wage changes," and that "[t]he most effective way to remedy this adverse effect on domestic agricultural workers is to impose a wage floor that approximates the equilibrium wage that would have resulted, and the most effective way to approximate such a wage is to consider [the market rates for] a broader geographic area than the local area considered for prevailing wages").
[45] *Id.* at 6898.
[46] *Id.* at 6899.
[47] *Id.* at 6898.
[48] *Id.* at 6899-6900.
[49] *Id.* at 6892.

15

new or changing labor market conditions"—caused in part by "[t]he physical distances and relative social isolation typical of many rural environments," the "low educational attainment" of farmworkers, and farmworkers' "disproportionately poor" economic status.[50]

42.    DOL further found in the 2010 Rule that the "significant decreases in farm worker wage[s] in many cases" after DOL altered the AEWR methodology in 2008 (by relying on OES survey data and establishing more localized wages) "suggests that an AEWR [based on FLS data] … has provided the protection it was intended to provide."[51]

### 2.    DOL's Proposed Rule Recognized The Significance of FLS Data And Anticipated Relying On Those Data To Protect U.S. Farmworkers

43.    In its Notice of Proposed Rulemaking (NPRM), published in the Federal Register on July 26, 2019, DOL proposed to continue its reliance on FLS data to establish AEWRs under the H-2A program.[52]

44.    Specifically, the NPRM proposed to establish separate AEWRs for distinct agricultural occupations within each state or region relying on FLS data.[53]  If the FLS did not report a wage for a specific occupation in a given state or region, the AEWR would instead be based on OES data.[54]  And if OES data did not include a statewide annual average hourly wage for a Standard Occupational Classification (SOC), then the AEWR would be based on the national wage for that occupational classification as determined by the FLS or OES.[55]

45.    The NPRM recognized that DOL "meets its obligation to protect against adverse effect on workers in the United States similarly employed primarily by requiring employers to offer, advertise, and pay the AEWR, which … is the required wage rate in approximately 92 percent of

---

[50] Id.

[51] Id. at 6893.

[52] Temporary Agricultural Employment of H–2A Nonimmigrants in the United States, 84 Fed. Reg. 36,168 (July 26, 2019).

[53] Id. at 36,179.

[54] Id.

[55] Id.

H-2A applications."[56]  DOL further explained that the AEWR protects U.S. farmworkers from adverse effects "because it is the wage rate that is determined from a survey of actual wages paid by employers."[57]

46.     The NPRM acknowledged that setting AEWRs below the amount that farmworkers are already being paid, as reflected in wage surveys, "cause[s] an adverse effect on the wages of workers in the United States similarly employed, contrary to [DOL's] statutory mandate."[58]  The NPRM similarly recognized that "inappropriately low[]" wages would have an adverse effect on farmworkers.[59]  Such inappropriately low wages could occur, DOL explained, if DOL were to use "generalized data" that did "not sufficiently tailor[]" wages to what those workers were being paid in the market.[60]  Indeed, DOL's intent in promulgating revised rules was "to produce *more tailored* AEWRs that better protect against adverse effect on workers in the United States similarly employed than [DOL's] current regulation."[61]

47.     Accordingly, DOL recognized that lowering AEWRs would be inconsistent with DOL's statutory mandate to protect U.S. workers from adverse effects unless those lower wages accurately reflect market wages.  DOL explained that "wage reductions" that result from "the use [of] more accurate occupational data … are consistent with [DOL's] obligation to protect against adverse effect on workers in the United States similarly employed."[62]  It was "[t]he use of more accurate occupational data," DOL emphasized, that "mean[t] that lower AEWRs … better reflect the wage needed to protect against adverse effect for those agricultural occupations."[63]

---

[56] *Id.*

[57] *Id.*; *see also id.* at 36,180 ("[B]ecause the AEWR is generally based on data collected in a multi-State agricultural region and an occupation broader than a particular crop activity or agricultural activity, … the AEWR protects against localized wage depression that might occur in prevailing wage rates.").

[58] *Id.* at 36,182.

[59] *Id.* at 36,171.

[60] *Id.*; *see also id.* at 36,178 (explaining that relying on "data more specific to the agricultural occupation of workers in the United States similarly employed … better protects against adverse effect on the wages of workers in the United States similarly employed").

[61] *Id.* at 36,179 (emphasis added).

[62] *Id.* at 36,184.

[63] *Id.*; *see also id.* at 36,186 (proposing to survey only U.S. farmworkers to determine local prevailing wages "to protect against possible adverse effect on the wages of workers in the United

17

48.    The NPRM also explained that "[t]he FLS [remained] the Department's preferred wage source for establishing the AEWR because it is the only comprehensive wage survey that collects data from farm and ranch employers."[64]  DOL recognized that it had "always used the FLS to set the H-2A AEWR, with the exception of a brief period under" its 2008 rule.[65]

49.    It was "[t]he use of the FLS survey," supplemented when needed by OES survey data, that "w[ould] allow [DOL] to establish AEWRs" that reflected farmworkers actual pay and "better protect against adverse effects."[66]  DOL praised the FLS because "the statewide and regional wages issued [using its data] provide protection against wage depression that is most likely to occur in particular local areas where there is a significant influx of foreign workers."[67]

50.    The NPRM stated that DOL anticipated that it would be able to use FLS data "to establish AEWRs for most States and regions" in occupational categories that "would represent approximately 89 percent of workers in the H-2A program," which meant that "the FLS w[ould] continue to be the basis for the AEWRs covering the vast majority of H-2A workers."[68]  DOL also expected that it would be able to rely on FLS data to establish AEWRs for a number of other occupations in various regions, further increasing the number of workers who DOL intended to protect using FLS data.[69]

51.    The NPRM acknowledged that USDA might "cease[] to conduct the FLS," and referenced two prior instances when USDA briefly paused the FLS for budgetary reasons.[70]  The NPRM downplayed those concerns, however, stating that "USDA is committed to this survey" and that USDA increased its FLS funding to facilitate its "expansion to collect more granular

States similarly employed" because "including the wages of non-U.S. workers may depress wages").
[64] *Id.* at 36,180.
[65] *Id.*
[66] *Id.*
[67] *Id.* at 36,182.
[68] *Id.*
[69] *Id.*
[70] *Id.* at 36,182-36,183.

18

data."[71]  DOL also assured commenters that if it were to "adjust the AEWR calculation [methodology] based on methodological changes by USDA, [DOL] w[ould] provide the public with notice and the opportunity to provide comment before adopting any changes."[72]

### 3. USDA's Attempt To Discontinue The FLS Without Providing Any Explanation Or An Opportunity To Comment

52. Since 1910, the Secretary of Agriculture has satisfied the statutory mandate to procure and preserve information concerning agriculture in part by conducting the Agricultural Labor Survey, referred to as the Farm Labor Survey.[73]  The FLS collects information from farm employers to obtain data on farm employment, hours worked, wages paid, and other statistics.

53. The National Agricultural Statistics Service (NASS)—USDA's statistical branch—publishes FLS data semiannually in May and November in the Farm Labor Report (FLR).  The May report includes employment and wage estimates based on January and April reference weeks, and the November report includes estimates based on July and October reference weeks.[74]  The November report also provides annual data based on quarterly estimates.[75]

54. The most recent FLR, published on May 28, 2020,[76] reported that "hired workers" were paid an average gross wage of $15.07 per hour during the April 2020 reference week, up 2% from the prior year.  The wage rate of field and livestock workers combined was $14.16 per hour, up 3% from the April 2019 reference week.  For the January 2020 reference week, the wage rate for field and livestock workers combined was $14.20 per hour, up 3% from the January 2019 reference week.  These January and April wage increases suggest that annual 2020 wage rates—ordinarily

---

[71] *Id*. at 36,178.
[72] *Id.* at 36,183.
[73] *See* Stan Daberkow & Leslie Whitener, *Agricultural Labor Data Sources: An Update* 6 (Aug. 1986), https://fraser.stlouisfed.org/files/docs/historical/Misc/usda_labordata_1986.pdf.
[74] *See* USDA NASS, *Farm Labor: Get the Data*, https://www.nass.usda.gov/Surveys/Guide_to_NASS_Surveys/Farm_Labor/ (last visited Nov. 30, 2020).
[75] *Id.*
[76] USDA, *Farm Labor* (May 28, 2020), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/n583zg017/dn39xm85z/fmla0520.pdf.

19

published in the November FLR—would be higher than 2019 wage rates used to establish 2020 AEWRs.

55.    On September 30, 2020, USDA abruptly announced that it had suspended October 2020 FLS data collection and canceled the November 2020 publication of the biannual FLR.[77] USDA did not solicit any public comment or employ formal rulemaking procedures.[78]  Although USDA's notice acknowledged that DOL depends on FLS data to publish AEWRs under the H-2A program,[79] the notice provided no rationale for suspending the FLS data collection or FLR publication.

56.    USDA's notice ignored that, just a year earlier, the agency had "committed to th[e] survey" and proposed to increase funding to expand the FLS.[80]  It also ignored that USDA had entered into formal agreements with DOL regarding the FLS, most recently in December 2019.[81] The December 2019 Memorandum of Understanding (MOU) acknowledged that DOL "relies exclusively upon the agricultural wage information provided by the [FLS] in performing its responsibilities under the Immigration and Nationality Act, which includes setting an [AEWR] for the H-2A temporary agricultural program."[82]   The MOU also expressly recognized DOL's "continued and recurring *bona fide* need for the information provided by the [FLS], which will allow [DOL] to produce the official AEWRs," and that "it is not possible for [DOL] to obtain the needed

---

[77] *Notice of Revision to the Agricultural Labor Survey and Farm Labor Reports by Suspending Data Collection for October 2020*, 85 Fed. Reg. 61,719 (Sept. 30, 2020).
[78] *See id.*
[79] *See id.* ("Number of workers and hours worked have been used to estimate agricultural productivity; wage rates have been used in the administration of the H–2A Program and for setting Adverse Effect Wage Rates. Survey data have also been used to carry out provisions of the Agricultural Adjustment Act.").
[80] 84 Fed. Reg. at 36,178.
[81] *See* December 2019 Memorandum of Understanding, *UFW v. Perdue*, No. 1:20-cv-1452-DAD-JLT (Oct. 13, 2020), ECF No. 3-11.
[82] *Id.* at 1.

1   information by any other means."[83]  In the agreement, DOL also agreed to continue to fund the FLS

2   through December 31, 2022, as it has done since 2011.[84]

3        57.    On October 13, 2020, Plaintiffs UFW and UFW Foundation challenged the USDA's

4   decision to cancel the FLS and FLR and sought a temporary restraining order and preliminary

5   injunction preventing USDA from implementing its decision.[85]  Plaintiffs argued that USDA's

6   decision was arbitrary and capricious—largely because it failed to consider DOL's reliance on the

7   FLS data—and failed to comply with the APA's notice-and-comment requirements.[86]  Plaintiffs

8   also explained that H-2A foreign guestworkers and U.S. farmworkers would be irreparably harmed

9   if FLS data from 2020, and the November 2020 FLR, were not available to DOL to establish 2021

10  AEWRs.[87]

11       58.    On October 28, 2020, the Court granted Plaintiffs' motion and enjoined USDA from

12  canceling the October 2020 FLS and ceasing publication of the November 2020 FLR.[88]  The Court

13  found that Plaintiffs were likely to prevail on most of their claims, explaining in part that "USDA's

14  cursory, one-page decision provides no indication that the USDA considered the impact on

15  farmworker wages caused by its decision to eliminate the FLS."[89]  The Court also found that

16  Plaintiffs' members and farmworkers across the country would "suffer immediate harms in the form

17  of economic hardship that cannot be undone through the payment of back wages."[90]  Those wages

18

19  ───────────────────

20  [83] *Id.* at 2; s*ee also id.* (explaining that the MOU "and accompanying transfer of fund are necessary
    to ensure that [DOL] has the necessary information regarding the wages of U.S. agricultural workers
21  to comply with its statutory and regulatory obligations, as well as DOL's stated commitment to
    providing fair wages and strong labor protections for all agricultural workers, as expressed in its H-
22  2A program regulations").  DOL has separately recognized that FLS data are critical to the H-2A
    program and protecting the wages of U.S. farmworkers.  *See, e.g.*, 75 Fed. Reg. at 6898.
23  [84] *Id.*
    [85] *See* Compl., *United Farm Workers v. Perdue*, No. 1:20-cv-1452-DAD-JLT (E.D. Cal. Oct. 13,
24  2020), ECF No. 1.
    [86] *See* Pls.' Mot. for TRO & Prelim. Inj. 9-21, *United Farm Workers v. Perdue*, No. 1:20-cv-1452-
25  DAD-JLT (E.D. Cal. Oct. 13, 2020), ECF No. 3.
26  [87] *Id.* at 21-23
    [88] *See United Farm Workers v. Perdue*, No. 1:20-cv-1452-DAD-JLT, 2020 WL 6318432 (E.D.
27  Cal. Oct. 28, 2020).
    [89] *Id.* at *10.
28  [90] *Id.* at *14.

were "directly traceable to … USDA's decision to suspend the FLS," the Court explained, "because the [notice suspending the FLS] and the AEWRs are inextricably connected" and, under current regulations, "AEWRs cannot be calculated without the FLS."[91] The Court also explained that even if DOL promulgated a rule with a new AEWR methodology, farmworkers "will suffer irreparable harm if the court does not preserve the status quo now because the October 2020 FLS data will not have been gathered and will not be available when it is needed" "if the DOL's new methodology is challenged and ultimately set aside, and the 2021 AEWRs ultimately require the FLS data to be calculated."[92]

59.    Accordingly, as of the date of this filing, USDA is obligated by court order to conduct the October 2020 FLS and publish the November 2020 FLR.[93]

### 4.    The Final Rule For The First Time Decouples AEWRs From Market Wages, Encouraging Wage Stagnation Or Depression

60.    DOL's Final Rule substantially departs from the AEWR regulation proposed in the NPRM and fundamentally alters the methodology for calculating AEWRs under the H-2A program in a way that essentially guarantees inaccuracy by untethering wages for most agricultural jobs from market wage rates paid to farmworkers—to the detriment of U.S. farmworkers and H-2A foreign guestworkers.  Those dramatic changes become effective on December 21, 2020.

61.    DOL elects to freeze the current 2020 AEWRs for two years.  The 2020 AEWRs are based on FLS data reflecting what farmworkers were paid in 2019.  Yet the Final Rule would maintain these 2019 wage rates as the AEWRs for most agricultural jobs in 2021 and 2022.[94]  Then, beginning in 2023, DOL will adjust those 2020 AEWRs annually by the Employment Cost Index (ECI)—an index that measures the change in the cost of labor by surveying various private industries, but notably *excluding* farms and agricultural workers.[95]  DOL will also establish AEWRs

---

[91] *Id.* at *15.

[92] *Id.*

[93] On November 25, 2020, the Court denied USDA's motion to modify and dissolve the temporary restraining order and preliminary injunction.  *See* Order, *United Farm Workers v. Perdue*, No. 1:20-cv-1452-DAD-JLT (E.D. Cal. Nov. 25, 2020).

[94] 85 Fed. Reg. at 70,452.

[95] *Id.*

each year—including in 2021 and 2022—for a smaller set of "higher-skilled" agricultural jobs using the annual statewide average hourly gross wage for the occupation based on the OES survey—a program administered by DOL's Bureau of Labor Statistics that excludes farms from its data collection.[96]

62.     As an initial matter, the Final Rule recognizes "that the use of an AEWR is necessary in order to effectuate its statutory mandate of protecting workers in the United States similarly employed from the possibility of adverse effects on their wages and working conditions."[97]   It further states that it is necessary to adopt AEWRs that "protect against the possibility that the anticipated expansion of the H-2A program will itself create wage depression or stagnation.'"[98] DOL also recognizes that "[s]etting the AEWR below the mean in the relatively low-skill agricultural occupations that predominate in the H-2A program [i.e., at below-market rates] would have a depressive effect on wages of workers in the United States similarly employed."[99]

63.     And even though the Final Rule decides to abandon the use of up-to-date FLS data to establish AEWRs, it acknowledges that the FLS provides the most accurate data available for ascertaining farmworkers' market wages.  It notes, for example, that "the FLS has been the *only comprehensive survey* of wages paid by farmers and ranchers."[100]  That is why, except for a single two-year period, DOL "has established an AEWR using FLS data for each state in the multi-state or single-state crop region to which the State belongs since 1987."[101]  FLS data has an advantage over alternatives, DOL explained, because it "survey[s] farm and ranch employers and collect[s] data on wages paid for field and livestock worker job opportunities common in the H–2A

---

[96] *Id.*

[97] *Id.* at 70,450.

[98] *Id.*

[99] *Id.* at 70,464; *see also id.* ("The Department must set the AEWR in a way that reasonably balances the needs and interests of workers in the United States similarly employed and employers and results in a wage that is a reasonable approximation of wages paid to workers in the United States similarly employed.").

[100] *Id.* at 70,467 (emphasis added); *see also id.* at 70,468 ("[T]he FLS has been the only comprehensive survey of wages paid by farmers and ranchers that has enabled the Department to establish hourly rates of pay for H-2A opportunities.").

[101] *Id.* at 70,457.

COMPLAINT

program."[102]   "Another advantage of the FLS has been its broad geographic scope, which 'provide[s] protection against wage depression that is most likely to occur in particular local areas where there is a significant influx of foreign workers,' and 'reflects the view that farm labor is mobile across relatively wide areas.'"[103]

64.   Tellingly, "given the comprehensiveness and relevance of the FLS data," DOL concludes that "it is appropriate to use the … results of the FLS published in November 2019[] as the starting point to establish AEWRs for most H-2A job opportunities during calendar years 2021 and 2022 and … in subsequent years."[104]   Nonetheless, DOL chooses not to use the updated FLS data, which must be produced pursuant to a court order, to publish AEWRs for 2021.

       **a.**    **DOL Relies Heavily On USDA's Now-Defunct Decision To End The FLS To Justify The Final Rule**

65.   DOL supports its decision, announced in its November 5, 2020 Final Rule, to use outdated FLS data—and every other aspect of the Final Rule, including the two-year wage freeze, the decision to adjust AEWRs using the ECI, and the decision to use OES survey data for certain wages—by pointing to USDA's September 30, 2020 decision to stop conducting the FLS and cease publication of the FLR.   The Final Rule explains, for instance, that DOL reached its conclusions because "USDA publicly announced its intent to cancel the planned October data collection" and that, as a result, it "may not release its November 2020 report."[105]   The rule concludes that "[i]n light of USDA's recent announcement regarding the FLS, the continued lack of any statutory or regulatory requirement that USDA conduct the FLS, and ongoing litigation over the announcement," relying on old FLS data instead of current FLS data is "appropriate in order to promote greater certainty in the setting of AEWRs in future years."[106]

---

[102] *Id.*

[103] *Id.*

[104] *Id.* at 70,446; *see also id.* at 70,457 (concluding that "the FLS is a useful source of wage data for establishing the AEWRs for the vast majority of H-2A job opportunities, and that alternative wage sources are … generally not superior to the FLS for the [DOL's] purposes in administering the H-2A program").

[105] *Id.* at 70,446.

[106] *Id.*; *see also id.* ("The Department has determined that this uncertainty regarding the near-term and long-term future of the FLS also weighs in favor of the Department establishing now a revised

66.   The Final Rule largely ignores (and sometimes misstates) the fact that, pursuant to a court order, FLS data will be available to establish AEWRs for 2021.[107]

**b.   The Final Rule Freezes Wages For Two Years To Halt Farmworker Wage Increases And Provide Cost Savings For Employers**

67.   Aside from USDA's decision to cancel the FLS, DOL's principal justification for freezing AEWRs for two years is a desire to depress market wages.

68.   DOL repeatedly acknowledges that a common, if not primary, objection of employers that pay H-2A wages is that AEWRs based on FLS data were increasing too quickly.  For example, the Final Rule acknowledges that employers, Farm Bureaus, and similar entities "opposed the AEWR methodology in the 2010 Final Rule [based on FLS data] and agreed that a new AEWR methodology is necessary, most often due to concerns that the 2010 Final Rule methodology produced unsustainable wage increases."[108]  Indeed, DOL concedes that AEWR increases caused by "variability" in recent FLS data—which, in DOL's view, results in "economic hardship to

---

methodology for determining the AEWR[.]"); *id*. at 70,452 (suggesting that the new rule is justified "in light of uncertainty about the immediate availability of FLS wage data"); *id*. at 70,455 (suggesting the new rule is reasonable "given uncertainty about the future of the FLS"); *id*. (stating that freezing AEWRs for two years and then adjusting those wage rates using the ECI was "particularly [appropriate] given uncertainty about the future of the FLS"); *id*. at 70,457 (expressing "concern[s] about using a data source beyond its control and which is subject to an uncertain future, demonstrated by the recent suspension of data collection"); *id*. at 70,458 (noting that DOL "does not control the production of new wage data from the FLS and recognizes the continued uncertainty about ongoing availability of FLS data"); *id*. at 70,459 (concluding that relying on OES survey data is also appropriate because of "the continued uncertainty about ongoing availability of FLS data, including to set the 2021 AEWRs").

[107] *See, e.g.*, *id*. at 70,468 (misstating that the FLS "has been suspended for October 2020").

[108] *Id*. at 70,451; *see also id*. ("Many of these commenters also asserted that the current AEWR methodology has resulted in significant wage inflation and unsustainable annual increases in the AEWR."); *id*. (noting that commenters opposed the proposed methodology relying on FLS data because, among other reasons, it would "produce unsustainably high AEWRs for some occupations"); *id*. at 70,452 (explaining that employers and others required to pay H-2A wages complained that "[t]he AEWRs have increased significantly compared to the rate of inflation or the rate at which compensation has increased for workers more generally in the U.S. economy"); *id*. ("Many employers, associations, and farm bureaus expressed concerns that the proposed AEWR methodology would result in wage increases that would be unsustainable for employers in industries where labor costs constitute the most significant outlay.").

farmers"—was what "led [DOL] to consider alternatives" to FLS data.[109]  Unsurprisingly, then, the Final Rule concludes that freezing wages for two years "best addresses commenters' concerns regarding the unpredictability and volatility of the AEWRs in recent years."[110]

69.    The Final Rule likewise recognizes that commenters expressed "concerns that recent accelerations in the wage rates are, in their view, attributable to flawed survey results and have caused artificially surging wage increases."[111]  Yet DOL rejected the idea that FLS data, or the AEWRs based on them, were flawed or inaccurate.[112]  Nonetheless, the Final Rule concludes that it is appropriate to freeze wages for two years to "balance[] commenters' concerns related to significant wages fluctuations" (i.e., increases based on allegedly faulty data—a premise that DOL rejected outright) "with [DOL's] obligation to protect against adverse effects" and avoid "the kind of unexpected wage changes that commenters expressed concerns about."[113]  Stated simply, even though DOL believes that FLS data accurately and comprehensively reflect market wages, the rule freezes AEWRs for two years to insulate employers from the market wage increases reflected by that FLS data.

70.    DOL's decision to freeze wages for two years, eliminating the consistent wage increases reflected by FLS data, is even harder to rationalize when considered alongside other available data.  Like the FLS, OES survey data reflects that farmworkers' wages have been increasing steadily over the last several years.  For example, average national wages for the

---

[109] *Id.* at 70,457.
[110] *Id.* at 70,452.
[111] *Id.* at 70,456.
[112] *Id.* ("[DOL] disagrees with the commenters' suggestions that the FLS survey results were flawed."); *see also id.* at 70,457 (explaining DOL has not "concluded that the wages established by the FLS data, including the 2020 AEWRs, were flawed").
     DOL has previously rejected arguments that the AEWRs based on FLS data are artificially high.  *See* 75 Fed. Reg. at 6896 ("The 2008 Final Rule explicitly stated that the decision to adopt the OES method for computing the AEWR does not reflect any belief on the part of the Department that all AEWRs are currently artificially high and that they therefore should all be lowered."); *Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement*, 73 Fed. Reg. 77,110, 77,172 (Dec. 18, 2008) (explaining DOL Final Rule "does not reflect any belief … that all [FLS-based] AEWRs are currently artificially high and that they therefore should all be lowered").
[113] 85 Fed. Reg. at 70,456.

1 | "Farmworkers and Laborers, Crop, Nursery, and Greenhouse" job classification (Standard

2 | Occupational Classification 45-2092) have increased annually by 5.9% between 2014 and 2019.[114]

3 | That data reinforces the simple fact (also exhibited by FLS data) that farmworker wages have been

4 | increasing more quickly than other wages in the U.S. economy.[115] Those same data show that

5 | farmworkers remain among the lowest-paid workers in the nation.

6 | 71. The Final Rule leaves little room for doubt about DOL's primary justifications for

7 | revising its AEWR rule. DOL pointedly explains that relying on "more recent, 2020 FLS wage

8 | data … to set 2021 AEWRS would only serve to perpetuate the very wage volatility [i.e., increases]

9 | that [DOL] seeks to ameliorate through this rule."[116]

10 | 72. Moreover, the Final Rule acknowledges concerns that its "changes to the

11 | methodology could result in stagnating or decreasing wages for farmworkers."[117] Instead of

12 | dispelling those concerns, DOL agrees that there is a "possibility that the revised methodology in

13 | this final rule may result in AEWRs for field workers and livestock workers being set at slightly

14 | lower levels in future years than would be the case under the current methodology."[118] DOL

15 |

16 |

---

17 | [114] *See* BLS, *Occupational Employment and Wages, May 2019: 45-2092 Farmworkers and*

18 | *Laborers, Crop, Nursery, and Greenhouse* (July 6, 2020), https://www.bls.gov/oes/current/oes

452092.htm (national average hourly wage of $13.36); BLS, *Occupational Employment and*

19 | *Wages, May 2018: 45-2092 Farmworkers and Laborers, Crop, Nursery, and Greenhouse* (Mar.

29, 2019), https://www.bls.gov/oes/2018/may/oes452092.htm (national average hourly wage of

20 | $12.72); BLS, *Occupational Employment and Wages, May 2017: 45-2092 Farmworkers and*

*Laborers, Crop, Nursery, and Greenhouse* (Mar. 30, 2018), https://www.bls.gov/oes/2017/may/

21 | oes452092.htm (national average hourly wage of $12.05); BLS, *Occupational Employment and*

22 | *Wages, May 2016: 45-2092 Farmworkers and Laborers, Crop, Nursery, and Greenhouse* (Mar.

31, 2017), https://www.bls.gov/oes/2016/may/oes452092.htm (national average hourly wage of

23 | $11.45); BLS, *Occupational Employment and Wages, May 2015: 45-2092 Farmworkers and*

*Laborers, Crop, Nursery, and Greenhouse*, https://www.bls.gov/oes/special.requests/oesm15nat

24 | .zip (national average hourly wage of $10.64); BLS, *Occupational Employment and Wages, May*

*2014: 45-2092 Farmworkers and Laborers, Crop, Nursery, and Greenhouse*, https://www.bls.gov/

25 | oes/special.requests/oesm14nat.zip (national average hourly wage of $10.01).

26 | [115] Moreover, DOL's refusal to rely on FLS data because of consistent wage increases contradicts

its decision to rely on OES survey data to set other wages. *See infra* ¶ 61.

27 | [116] 85 Fed. Reg. at 70,453.

[117] *Id.*

28 | [118] *Id.*

concludes, however, that the benefits of stopping (for two years) and then slowing the increase in AEWRs outweighs concerns that AEWRs may be depressed below market rates.[119]

73.    Finally, the Final Rule suggests that a two-year wage freeze for certain agricultural jobs is needed to allow employers to "familiarize themselves with the new wage methodology, understand its likely impact on wages in future years, and plan accordingly."[120]   On its face, this justification does not account for the prospect of continuing to issue AEWRs based on updated FLS data, which would simply be a continuation of DOL's current practice and not a "wholly new methodology."[121]

> **c.    The Final Rule Belatedly Adjusts Farmworker Wages By The ECI To Slow Future Wage Increases**

74.    The Final Rule similarly justifies the decision to adjust AEWRs by the ECI starting in 2023 because that method will prevent AEWRs from increasing at historic, market rates.  DOL again notes that employers and others expressed concerns about the "unpredictable and often significant annual increases of FLS-based AEWRs."[122]  DOL concludes that "tethering the AEWRs to broad economic data on labor costs using the ECI … and adjusting the AEWRs annually beginning in calendar year 2023" addressed those concerns.[123]

75.    For support, the Final Rule explains that the average annual ECI adjustment over the last decade would have been 2.78%, less than the amount that AEWRs typically increase when they were based on FLS data—which DOL recognizes had often been 3-5% annually.[124]

76.    Put simply, DOL decided that relying on the ECI to adjust AEWRs would slow the wage increases that occurred when the AEWR was tied to market wages based on FLS data.

---

[119] *Id.*
[120] *Id.* at 70,452.
[121] *Id.*
[122] *Id.* at 70,455.
[123] *Id.*; *see also id.* at 70,456 ("[DOL] believes that the new methodology will reduce the significant fluctuations in AEWRs and address the concerns raised by commenters about the need for certainty.").
[124] *Id.*

77.     The Final Rule also explains why DOL believes it inappropriate to adjust the 2020 AEWRs by the ECI to establish 2021 AEWR, namely, because waiting two years before applying the adjustment avoids the "unexpected wage changes that commenters expressed concerns about."[125]  However, it is unclear exactly what would be unexpected about those increases.  As DOL explained, the reason it chose to use ECI data to adjust AEWRs is because the resulting increases would be predictable and consistent.[126]

78.     The Final Rule also undermines any argument that wage changes could be "unexpected" for 2021.  As commenters' complaints about increasing H-2A wages reflect, AEWRs were expected to be higher in 2021 than in 2020.  Indeed, the April 2020 FLR indicated that the market wages for field and livestock workers combined had increased 3% year-over-year, eliminating any doubt that the increasing-wage trend was continuing.

79.     What the Final Rule does *not* explain is why it is appropriate to delay market adjustments for two years and then fail to incorporate in future AEWRs the effects of increased wages that would have applied in those skipped years.  If historical trends continue, the ECI will reflect increases in economy-wide average wages in both 2021 and 2022—albeit smaller increases than expected for agricultural wages.  Yet those 2021 and 2022 wage increases will never be reflected in the AEWRs for 2023 and beyond.  Therefore, even if the ECI were a suitable index for annual adjustment—and it is not—the Final Rule unjustifiably suppresses future wages and deprives H-2A and similarly employed U.S. farmworkers of two years' worth of wage growth.  These losses to farmworkers will be compounded indefinitely, because the annual ECI adjustments will never allow farmworker wages to catch up to where they would have been absent the wage freeze.

---

[125] *Id.* at 70,456.

[126] *Id.* at 70,455 ("ECI-based adjustments to the AEWRs for these occupations will ensure field and livestock worker wages continue to rise apace with wages in the broader U.S. economy in a consistent and predicable manner.").

1

2

     **d.**    **The Final Rule Relies On OES Survey Data To Establish AEWRs For Certain Jobs, Recognizing That Those Wages Must Be Tied To Market Rates To Protect Against Adverse Effects**

3

4

5

6

7

8

9

10

11

12

13

    80.    The Final Rule concludes that it is appropriate to rely on OES survey data for certain highly skilled agricultural sector jobs because FLS data do not accurately reflect the market wages for those occupations.[127]  DOL explains that even if AEWR increases were to occur because of the change in methodology, relying on OES survey data is still appropriate because "these changes are the result of [DOL's] use of more accurate occupational data that better reflect the actual wage paid, and thus the wage needed to protect against adverse effect."[128]  Using alternative data, DOL explained, "may have the effect of depressing wages in higher-paid occupations," which would "cause an adverse effect on the wages of workers in the United States similarly employed, contrary to [DOL's] statutory mandate."[129]  In other words, DOL recognizes that for "highly skilled" labor, it is necessary to rely on data that accurately reflects actual market wages to establish AEWRs to protect U.S. farmworkers from adverse effects, thereby fulfilling DOL's statutory mandate.

14

15

    **e.**    **The Final Rule Applies Inconsistent Reasoning To Reject Alternative Proposals**

16

17

18

    81.    DOL relies on rationales that are inconsistent with or undermine the justifications offered for other aspects of the rule to reject commenters' alternative proposals for establishing AEWRs.

19

20

21

22

23

    82.    For instance, DOL declined to adopt other proposals that would have established pre-set AEWRs that would then be adjusted annually (including an AEWR set at a specific dollar amount above federal or state minimum wages and adjustments based on the Consumer Price Index).  The Final Rule explains that DOL "establishes wages based on data related to actual wages paid to workers."[130]  "[T]he Federal minimum wage," DOL explained, "does not sufficiently relate

24

---

25

[127] *Id.* at 70,453.

26

[128] *Id.*; *see also id.* at 70,458 (finding that because "the OES is more accurate than the FLS for [certain] agricultural occupations, such as supervisors, … its use will better protect against adverse effect for those occupations for which the FLS did not provide valid wage data at a state or regional level").

27

[129] *Id.* at 70,458-70,459.

28

[130] *Id.* at 70,461.

to the actual wages paid to" farmworkers.[131]   It rejected similar proposals because "in many instances" the wages would "possibly [be] disconnected from wages actually paid in the area of employment."[132]  DOL thus recognizes that setting AEWRs at below market rates would "result in … adverse effects" to U.S. farmworkers.[133]  Similarly, DOL recognizes that a wage "cap would also produce wage stagnation, most significantly in years when the wages of U.S. workers are rising faster due to strong economic and labor market circumstances."[134]

83.     DOL also rejected claims that AEWRs based on FLS data are "unfairly inflated."[135] As a result, DOL "decline[d] to adopt" commenter proposals that would have modified minimum wage requirements to account for "inaccurate AEWR determinations" (which would have resulted in lower pay for farmworkers) "because of its longstanding determination that such approaches would lead to an adverse effect on the wages of workers in the United States similarly employed in violation of [DOL's] statutory mandate."[136]  The Final Rule explains that "[r]equiring employers to guarantee an hourly AEWR based on a wage survey … has been [DOL's] interpretation of H-2A statutory requirements since the 1980s."[137]  Strangely, that explanation fails to acknowledge that DOL decoupled AEWRs for most agricultural jobs from the relevant wage survey—the FLS.

84.     Finally, DOL rejected a proposal to continue relying on FLS data to establish AEWRs unless another data source, such as the OES survey, reflects that farmworkers were being paid a higher wage.  The Final Rule explains that "[r]equiring payment of the highest wage rate among all available sources at all levels of geographic specificity, regardless of the occupation and area of intended employment, would in many cases require an employer to pay an enhanced wage untethered to actual wages paid to similarly employed workers in the area."[138]

---

[131] *Id.*

[132] *Id.*

[133] *Id.*; *see also* 73 Fed. Reg. at 77,172 ("If the AEWR in any given area does not reflect market wages, it will either harm U.S. workers directly by artificially lowering wages, or it will harm U.S. workers indirectly by providing an incentive for employers to hire undocumented workers.").

[134] 85 Fed. Reg. at 70,462.

[135] *Id.* at 70,463.

[136] *Id.*

[137] *Id.*

[138] *Id.* at 70,464.

31

85.     In short, DOL repeatedly recognizes that it is critical that AEWRs reflect the actual wages paid to farmworkers in the relevant market to protect against the adverse effects (wage depression or stagnation) caused by the hiring of H-2A foreign guestworkers.  Nonetheless, the Final Rule flouts that principle and revises the AEWR methodology so that those minimum wages do *not* reflect the market wages actually paid to U.S. farmworkers.

E.     **Farmworkers Will Be Harmed By The Final Rule's Decision To Freeze Wages And Stop Calculating AEWRs Based On Data About Farmworker Market Wages**

86.     There are about 2.4 million farmworkers in the United States, and approximately 200,000 of those workers are foreign guestworkers hired through the H-2A program.  Many U.S. farmworkers work alongside H-2A workers at H-2A program employers, and their wages are determined by the minimum rates established under the H-2A program.

87.     The AEWR is a minimum wage rate that must be offered and paid to both U.S. and foreign workers by employers seeking permission to hire H-2A workers.  The AEWR is meant to protect U.S. workers' wages from decreasing in response to an influx of foreign guestworkers.

88.     The Final Rule—which becomes effective December 21, 2020 and will govern H-2A wages in 2021—will result in U.S. farmworkers and H-2A foreign guestworkers being paid materially less than they would have under DOL's current regulations.

89.     First, the Final Rule freezes 2020 AEWRs—based on data reflecting what farmworkers were paid in 2019—for two years.  As a result, AEWRs in 2021 and 2022 will not reflect any market increases to farmworkers' wages that have occurred (or will occur) since wage data was collected in 2019.

90.     Such increases are far from hypothetical.  The May 2020 FLR, for example, recognizes that farmworker wages in April 2020 had increased by 3% nationwide compared to 2019, from $13.73 to $14.16 per hour.[139]  Increases were even greater in states with substantial numbers

---

[139] USDA, *Farm Labor* (May 28, 2020), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/n583zg017/dn39xm85z/fmla0520.pdf.

COMPLAINT

of H-2A workers.  In California, for example, farmworker wages increased from $14.70 to $15.76 from April 2019 to April 2020—a 7.2% increase.[140]

91.     Those increases align with historic trends, which show that farmworker wages have consistently been increasing by more than 4% nationally.[141]  In some states, such as California,[142] Oregon and Washington[143], the AEWRs published by DOL reflect that wage increases have been greater.  DOL itself recognizes that the AEWR has been increasing steadily in recent years by upwards of 3% (and in fact justifies its new rule as a means to combat those market increases).[144] Eliminating those wage increases for two years would create severe hardship for farmworkers, including UFW and UFW Foundation members.

92.     The Final Rule would cause farmworkers to be paid meaningfully less than the current AEWR methodology.  As discussed, recent FLS data suggests that the California AEWR would have increased to approximately $15.58 in 2021.[145]  Under the Final Rule, however, those wages would be frozen at the 2020 AEWR of $14.77—the amount that farmworkers were paid in 2019.[146] Because most farmworkers (including Plaintiffs' members) at H-2A employers are paid the AEWR, most farmworkers working at H-2A employers in California will be paid approximately $0.81 less per hour— totaling $139.32 per month and $1,393.20 over a ten-month farming season—under the Final Rule.

93.     Farmworkers in Oregon and Washington will experience similar losses.  The latest FLS data suggests that the Oregon and Washington AEWRs would have increased by approximately

---

[140] *Id.* at 5, 12.
[141] *See supra* ¶¶ 31 (FLS data), 70 (OES data).
[142] DOL, *AEWR Trends*, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/2c.%20AEWR%20TRends%20in%20PDF_12.16.19.pdf (documenting a 5.44% average yearly increase to California AEWR between 2015 and 2020).
[143] *Id.* (documenting a 4.96% average yearly increase to Oregon's and Washington's AEWR between 2015 and 2020).
[144] 85 Fed. Reg. at 70,455-70,456; *supra* ¶ 74.
[145] *See* USDA, *Farm Labor* 5, 12 (May 28, 2020), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/n583zg017/dn39xm85z/fmla0520.pdf.
[146] *See* DOL, *AEWR Trends*, https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/2c.%20AEWR%20TRends%20in%20PDF_12.16.19.pdf; USDA, *Farm Labor Report* 25 (Nov. 21, 2019), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/c821h164m/fq9788943/fmla1119.pdf.

$0.45 per hour in 2021.[147]  The Final Rule thus causes farmworkers employed by H-2A employers in those states to be paid $77.40 less per month, totaling $774 in lost wages over a ten-month farming season.

94.     Moreover, by freezing AEWRs for two years, employers will be incentivized (and permitted) to hire H-2A foreign guestworkers over U.S. farmworkers.  If U.S. farmworkers demand to be paid current, market rates (i.e., market rates in 2020, not 2019), employers will lawfully be allowed to refuse to hire those workers and instead opt for cheaper foreign labor.  Indeed, DOL recognizes that the Final Rule "may further encourage U.S. employers to use more H-2A workers" because more U.S. farmworkers will be rendered "unavailable" by requesting market wages.[148]  U.S. farmworkers will be harmed by losing those job opportunities.

95.     Second, starting in 2023, DOL will adjust the 2020 AEWRs using the ECI.  That metric similarly fails to reflect the substantial increases to farmworker wages in recent years.  DOL acknowledges as much, explaining that ECI adjustments will result in more modest increases to farmworker wages compared to the larger increases that have occurred in the market.[149]  Those below-market wages will harm U.S. farmworkers and H-2A guestworkers, including UFW and UFW Foundation members, who are already struggling to make ends meet with subsistence wages.

96.     DOL does not dispute that farmworkers will suffer under its new rule by receiving lower wages.  To the contrary, the Final Rule explicitly recognizes that farmworkers will be harmed by DOL's new methodology.  The Final Rule concedes that farmworker wages will decline significantly under the new AEWR methodology.  In 2021 and 2022 alone, wages for one of the largest groups of farmworkers (those categorized under SOC 45-2092) would decrease by $61 million and $120 million, respectively.[150]  DOL explains that those lost wages "constitute a transfer payment from H-2A employees to H-2A employers," i.e., employers benefit under the Final Rule

---

[147] *See* USDA, *Farm Labor Report* 5, 7, 13, 15 (Nov. 21, 2019), https://downloads.usda.library.cornell.edu/usda-esmis/files/x920fw89s/c821h164m/fq9788943/fmla1119.pdf (documenting that January and April wages in Oregon and Washington increased by $0.60 and $0.30 between 2019 and 2020).
[148] 85 Fed. Reg. at 70,472.
[149] *See supra* ¶ 75.
[150] 85 Fed. Reg. at 70,472.

by paying farmworkers less.[151]  Altogether, the Final Rule results in "average annual undiscounted transfers of $167.76 million," with a total "transfer" of $1.68 billion over the next ten years.[152]  Thus, DOL recognizes that H-2A workers will lose $1.6 billion dollars in wages under its new rule.

97.   Moreover, DOL acknowledges that U.S. farmworkers will experience corresponding harms, but does not measure those additional losses in the Final Rule.  DOL recognizes that the wage decreases under the Final Rule "represent[] an important transfer from non-H-2A workers [i.e., U.S. farmworkers] in corresponding employment to agricultural employers, not just H-2A workers to agricultural employers."[153]  However, the Final Rule represents that DOL "does not have sufficient information about the number of workers in corresponding employment affected and their wage structure to reasonably measure the wage transfer to or from these [U.S.] workers."[154]  DOL therefore recognizes that U.S. farmworkers will experience decreased wages that are not included in the $1.68 billion figure, meaning that the actual economic harm from DOL's rule is likely greater than the amount described in the Final Rule.[155]

98.   Farmworkers are already among the lowest-paid workers in the United States,[156] with as many as 33% earning incomes below poverty.[157]  As a group, they tend to be less educated, making it difficult to seek alternative employment.  They often endure brutal conditions with few of the labor protections afforded to workers in other industries.[158]  Any wage depression experienced by those living on such meager wages will necessarily be harmful.  Because of circumstances created by the COVID-19 pandemic, farmworkers are finding it even more difficult to meet basic

---

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] DOL also estimates that H-2A hiring will increase by only 6.2%, when actual H-2A hiring has increased by 17.2%.  *See* 85 Fed. Reg. at 70,468-70,469.  The Final Rule thus understates the transfers (i.e., total lost wages) even for H-2A workers.

[156] *See supra* ¶ 25.

[157] DOL, *Findings from the National Agricultural Workers Survey (NAWS) 2015-2016: A Demographic and Employment Profile of United States Farmworkers* (Jan. 2018), https://www.dol.gov/sites/dolgov/files/OASP/legacy/files/NAWS-Research-Report-13.pdf. .

[158] Kamala Kelkar, *When Labor Laws Left Farm Workers Behind – and Vulnerable to Abuse*, PBS.com (Sept. 18, 2016), https://www.pbs.org/newshour/nation/labor-laws-left-farm-workers-behind-vulnerable-abuse.

COMPLAINT

needs such as shelter and food.[159]  A wage freeze that prevents wage increases in line with market conditions is substantially equivalent to a wage decrease.  Many farmworkers would struggle to support themselves and their families if their wages were lowered even by one or two dollars an hour.  In economic conditions that do not allow individuals any flexibility to meet their basic needs, any wage withholding creates a harm that cannot be remedied by future restitution.[160]

## CLAIMS FOR RELIEF

### Count One (Violation of Administrative Procedure Act, 5 U.S.C. § 706)

#### *The Final Rule Contravenes The Governing Statute*

99.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

100.    The APA requires this Court to hold unlawful and set aside any agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).  Regulations "that are contrary to clear Congressional intent or frustrate the policy that Congress sought to implement must be rejected." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 765 (9th Cir. 2007); *see also Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020).

101.    The Final Rule contravenes the INA's mandate that DOL ensure that the hiring of temporary foreign guestworkers "will not adversely affect the wages and working conditions of workers in the United States similarly employed."[161]

102.    DOL acknowledges that it relies primarily on AEWRs to protect U.S. farmworkers from adverse effects on their wages.  DOL has also repeatedly recognized that AEWRs must be based on market rates to protect against the adverse effects caused by the hiring of foreign guestworkers—namely, wage stagnation and depression.  The Final Rule, however, untethers

---

[159] Anita Chabria, *Many California Farmworkers Fear a Winter of Hunger and Homelessness Amid the Pandemic*, L.A. Times (Oct. 26, 2020), https://www.latimes.com/california/story/2020-10-26/central-valley-farmworkers-hunger-evictions-coronavirus-covid19.

[160] *See, e.g. United Farm Workers v. Perdue*, No. 1:20-cv-1452-DAD-JLT, 2020 WL 6318432, at *14 (E.D. Cal. Oct. 28, 2020).

[161] 8 U.S.C. § 1188(a).

36

1
2
3
4
5
6
7
8
9

DOL's AEWR methodology from any measure of actual market wages paid to farmworkers. Instead, the rule freezes wages for two years (plainly severing those wages from market values) and then later adjusts that frozen wage by the ECI—a metric that has no relation to farmworker wages—without making up for the two years of annual increases during the freeze. DOL's attempt to justify those changes by pointing to commenters' concerns that AEWRs had been increasing too rapidly only underscores that DOL's desire to depress farmworker wages under the H-2A program contravenes its statutory mandate under the INA to prevent adverse effects on U.S. farmworkers.

10
11

103. For these reasons and others, the Final Rule must be vacated and "set aside" as an agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

12

**Count Two (Violation of the Administrative Procedure Act, 5 U.S.C. § 706)**

13

*The Final Rule Is Arbitrary And Capricious*

14

104. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

15
16
17
18
19
20

105. The APA requires this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion … or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy that core requirement, an agency must "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48.

21

106. The Final Rule fails this statutory requirement for at least three reasons.

22
23
24
25
26
27

107. First, DOL's rule fails to justify its imposition of a two-year wage freeze, thereby violating the "'fundamental requirement of administrative law … that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014). While DOL cites the unavailability of FLS data, the Final Rule ignores the fact that USDA is currently under a court order expeditiously to collect FLS data and publish the FLR as usual, thereby permitting AEWR

28

calculations under the existing methodology. This undermines the premise that an immediate wage freeze is required to provide "certainty" before adopting a new methodology. Moreover, having repeatedly admitted that federal law requires wage rate protections based on trends in the labor market for farmworkers, DOL's decision to fix the AEWRs at 2020 levels for two years is, at its essence, arbitrary and capricious.

108.   Second, DOL's Final Rule irrationally adopts a generic wage index to adjust AEWRs starting in 2023. This decision contradicts the Final Rule's emphasis elsewhere regarding the need to use accurate data on agricultural labor markets. Moreover, the Final Rule recognizes that FLS data are accurate and comprehensive reflections of agricultural labor markets, contradicting DOL's conclusion that AEWR calculation needs to move away from FLS data to make it more predictable. Again, despite acknowledging its obligation to rely on wage rates in the farm labor market to set AEWRs, DOL chooses to adjust farmworker minimum wages using an index that it admits does not measure trends in farmworker wages. Agency regulations are arbitrary and capricious where they rely on reasoning that is "internally inconsistent and inadequately explained." *Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017) (quoting *District Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015)).

109.   Third, the Final Rule is arbitrary and capricious because DOL fails to analyze the economic effects of the new AEWR methodology on U.S. workers. Considering the protection of U.S. farmworkers is the central purpose of the AEWR and required by the INA, the Final Rule "entirely failed to consider an important aspect of the problem" before it. *State Farm*, 463 U.S. at 43. This omission makes the rule arbitrary and capricious.

110.   For these reasons and others, the Final Rule must be vacated and "set aside" as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### Count Three (Violation of the Administrative Procedure Act, 5 U.S.C. § 553)

#### *DOL Violated The APA's Requirement Of Notice-And-Comment Rulemaking*

111.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

112.   The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

113.   The APA, 5 U.S.C. § 553, requires (with certain exceptions not applicable here) that agencies publish notice of any proposed substantive rule in advance in the Federal Register, and that the public is given an opportunity to comment on proposed rules before they take effect.  Moreover, agencies must submit substantive rules to additional notice and comment if they diverge substantially from the initial proposal, such that the public was not provided sufficient notice of the issues the rule would address.  "[A] final rule which departs from a proposed rule must be a logical outgrowth of the proposed rule….  The essential inquiry focuses on whether interested parties reasonably could have anticipated the final rulemaking from the draft permit."[162]

114.   The Final Rule is a "rule" within the meaning of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

115.   The Final Rule is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice."  5 U.S.C. § 553(b).  To the contrary, it is a substantive rule that alters U.S. farmworkers' and foreign guestworkers' rights and obligations under the law.

116.   The Final Rule diverges materially from the proposed rule published in the Federal Register on July 26, 2019.  As a result of those substantial differences, the public was not provided with sufficient notice about the Final Rule's contents and were not provided an adequate opportunity to provide comments.

117.   Absent "good cause" for not doing so, DOL was required to provide additional notice of its proposed rule and an opportunity for public comment, *see* 5 U.S.C. § 553(b), (c)—which it has not done.  DOL has not made a "good cause" finding for failing to follow APA's procedural requirements here, nor could it.

---

[162] *NRDC v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) (quoting *NRDC v. EPA*, 863 F.2d 1420, 1429 (9th Cir. 1988)).

39

1   118.   Because DOL promulgated the Final Rule without additional notice and comment, the

2   regulation is unlawful and must be vacated.

3                              **PRAYER FOR RELIEF**

4        Wherefore, Plaintiffs respectfully seek the following relief:

5        1.   Preliminary and permanent injunctive relief preventing Defendants from

6   implementing or otherwise taking any action to enforce the challenged regulation in the Final Rule;

7        2.   An order vacating and setting aside the challenged regulation;

8        3.   A declaration that the challenged regulation is unlawful under the Administrative

9   Procedure Act;

10       4.   An order awarding Plaintiffs their costs and attorney's fees; and

11       5.   Any and all other such relief as the Court may deem appropriate.

12   DATED:  November 30, 2020            Respectfully submitted,

13                                        */s/  Mark D. Selwyn*
                                          Mark D. Selwyn (SBN 244180)
14                                        WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
15                                        2600 El Camino Real, Suite 400
16                                        Palo Alto, CA  94306
                                          Telephone:    (650) 858-6031
17                                        Facsimile:    (650) 858-6100
                                          mark.selwyn@wilmerhale.com
18
19                                        *Attorney for Plaintiffs*

20

21

22

23

24

25

26

27

28

COMPLAINT