1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT
9               FOR THE EASTERN DISTRICT OF CALIFORNIA
10
11   UNITED FARM WORKERS, et al.,            No. 1:20-cv-01690-DAD-JLT
12              Plaintiffs,
13        v.                                 ORDER GRANTING PLAINTIFFS' MOTION
                                             FOR A PRELIMINARY INJUNCTION
14   THE UNITED STATES DEPARTMENT
     OF LABOR, et al.,                       (Doc. No. 5)
15
                Defendants.
16
17

18        This matter came before the court on December 14, 2020 for hearing on the motion for a

19   preliminary injunction on behalf of plaintiffs United Farm Workers and UFW Foundation

20   (collectively, "plaintiffs"). (Doc. No. 5.) Attorneys Mark Selwyn, Derek Woodman, Nicholas

21   Werle, Bruce Goldstein, Trent Taylor, and Gabriela Hybel appeared by video for plaintiffs, and

22   United States Department of Justice Trial Attorney Michael Gaffney appeared by video for

23   defendants the United States Department of Labor ("DOL") and Eugene Scalia, the Secretary of

24   Labor (collectively, "defendants"). For the reasons explained below, the court will grant

25   plaintiffs' motion for a preliminary injunction.

26                              **BACKGROUND**

27        In their complaint, plaintiffs allege the following. Of the two to three million

28   farmworkers currently in the United States, over 200,000 are H-2A foreign guestworkers. (Doc.

                                          1

No. 1 ("Compl.") at ¶ 24.)  The H-2A agricultural guestworker program permits agricultural employers to hire foreign workers on a temporary basis under certain circumstances.  (*Id.* at ¶ 17.) The H-2A program is rooted in the Immigration and Nationality Act of 1952 ("INA"), which created a broad class of non-immigrant "H" visas for temporary admission of foreign workers to provide temporary or seasonal labor in sectors of the economy where there are shortages of U.S. workers.  (*Id.* at ¶ 32.)  The INA was later amended to establish the separate H-2A visa classification for agricultural labor.  (*Id.*)  As amended, the INA prohibits the United States Department of Homeland Security from issuing an H-2A visa unless the employer seeking to hire foreign guestworkers has applied for and received a certification from the DOL that:  (a) "there are not sufficient workers who are able, willing, and qualified" and available to perform the sought for services, and (b) the foreign workers' temporary employment "will not adversely affect the wages and working conditions of workers in the United States similarly employed." (*Id.* at ¶ 32.)  This certification requirement furthers the INA's purpose of protecting U.S. workers from the potential adverse effects of an influx of guestworkers in that certification prohibits agricultural employers from hiring foreign guestworkers unless they have shown that the U.S. labor market cannot supply the required workers, and then requires that this supplemental, foreign labor supply not harm U.S. farmworkers' wages and working conditions.  (*Id.* at ¶ 33.)

To prevent adverse effects on U.S. workers, the DOL's regulations require that employers utilizing the H-2A program pay a wage that is the highest of either:  (1) the Adverse Effect Wage Rate ("AEWR"), (2) the prevailing wage rate, (3) an agreed-upon collective bargaining wage, or (4) the federal or state minimum wage.  (*Id.* at ¶ 35.)  Under those regulations, the DOL relies primarily on a two-pronged approach based on the AEWR and prevailing wage rate to guard against wage depression that would otherwise result from the hiring of high numbers of foreign agricultural workers.  (*Id.*)  The prevailing wage rate protects local wages paid, while the AEWR sets a state-wide wage floor to prevent wage disparities over larger geographic areas.  (*Id.* at ¶ 36.)  The AEWR, however, is the primary wage rate under the H-2A program because it is higher than the other wages in most circumstances.  (*Id.*)  As a result, the AEWR determines the

/////

wages of approximately 92 percent of the farmworkers working for H-2A program employers. (*Id.*)

Prior to December 21, 2020, the DOL's regulations required the DOL to use the United States Department of Agriculture's ("USDA") Agricultural Labor Survey, commonly referred to as the Farm Labor Survey ("FLS"), in order to calculate the AEWR. (*Id.* at ¶ 37.) The USDA has conducted the FLS since 1910. (*Id.* at ¶ 52.) The FLS collects information from farm employers to obtain data on farm employment, hours worked, wages paid, and other statistics. (*Id.*) The National Agricultural Statistics Service ("NASS")—the USDA's statistical branch— publishes FLS data semiannually in May and November in the Farm Labor Report ("FLR"). The May report includes employment and wage estimates based on January and April reference weeks, and the November report includes estimates based on July and October reference weeks. (*Id.* at ¶ 53.) The November report also provides annual data based on quarterly estimates. (*Id.*)

Aside from a brief two-year period starting in 2008, the DOL's regulations required it to use the FLS to calculate the AEWR for the H-2A program since the program's inception in 1986. (*Id.* at ¶ 37.) The DOL had also used FLS data for the H-2A's predecessor program since 1953. (*Id.*) Because of the DOL's longstanding reliance on the FLS, the USDA has conducted the FLS in cooperation with the DOL, and the DOL has funded the FLS since July 2011 pursuant to a memorandum of understanding between the two agencies. (*Id.*) Indeed, in a December 2019 memorandum of understanding between the DOL and the USDA, the DOL agreed to continue funding the FLS through December 31, 2022. (*Id.* at ¶ 56.)

Under the DOL's prior regulations, which were adopted in 2010, the DOL sets an AEWR for each state or multi-state region using "[t]he annual weighted average hourly wage for field and livestock workers (combined) . . . as published annually by the U.S. Department of Agriculture . . . based on its quarterly wage survey," the FLS. (*Id.* at ¶ 38; *see also Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6,884 (Feb. 12, 2010) ("the 2010 Rule"). That 2010 Rule explained that the AEWR seeks to approximate the market wages that would exist absent an influx of foreign workers, thus "put[ting] incumbent farm workers in the position they would have been in but for the H-2A program." (Compl. at ¶ 39.)

The DOL elucidated that the AEWR was premised on the idea that "an increase of workers under the H-2A program" would prevent wages from "increas[ing] by an amount sufficient to attract more [U.S.] workers until supply and demand were met in equilibrium." (*Id.*)  In other words, "the AEWR avoids adverse effects on currently employed workers by preventing wages from stagnating at the local prevailing wage rate when they would have otherwise risen to a higher equilibrium level over time." (*Id.*)  The DOL has recognized that without the protections afforded by AEWRs set at regional or state-wide market rates, farmworkers "would be adversely affected by lowered wages as a result of an influx of temporary foreign farm workers." (*Id.*)

In adopting the 2010 Rule, the DOL also concluded that the FLS was the best available data source for establishing AEWRs. (*Id.* at ¶ 40.)  The DOL explained at that time that "[t]he FLS is the only annually available data source that actually uses information sourced directly from [farm employers]," which "is a strong advantage of the FLS as the AEWR data source compared to all other alternatives." (*Id.*)  Additionally, the FLS's "broader geographic scope makes the FLS more consistent with both the nature of agricultural employment and the statutory intent of the H-2A program." (*Id.*)  In short, FLS data was best suited to protect against adverse effects because it allowed the DOL to establish AEWRs at regional market rates. (*Id.*)  Conversely, the DOL recognized that using data other than the FLS to calculate AEWRs—in that case, the DOL's Occupational Employment Statistics ("OES") survey data—"entails a significant risk that U.S. workers may in the future experience wage depression as a result of unchecked expansion of the demand for foreign workers." (*Id.*)

On July 26, 2019, the DOL published a Notice of Proposed Rulemaking ("NPRM") proposing to continue its reliance on FLS data to establish AEWRs under the H-2A program. (*Id.* at ¶ 43); *see also Temporary Agricultural Employment of H-2A Nonimmigrants in the United States*, 84 Fed. Reg. 36,168 (July 26, 2019) ("the NPRM").  Specifically, the NPRM proposed to establish separate AEWRs for distinct agricultural occupations within each state or region relying on FLS data. (*Id.* at ¶ 44.)  If the FLS did not report a wage for a specific occupation in a given state or region, the AEWR would instead be based on OES data. (*Id.*)  Further, if OES data did not include a statewide annual average hourly wage for a standard occupational classification,

1   then the AEWR would be based on the national wage for that occupational classification as

2   determined by the FLS or OES.  (*Id.*)

3        However, on September 30, 2020, the USDA abruptly announced that it had suspended

4   data collection for the October 2020 FLS and canceled the November 2020 publication of the

5   biannual FLR.  (*Id.* at ¶ 55); *see also Notice of Revision to the Agricultural Labor Survey and*

6   *Farm Labor Reports by Suspending Data Collection for October 2020*, 85 Fed. Reg. 61,719

7   (Sept. 30, 2020) ("FLS Suspension Notice").  On October 13, 2020, plaintiffs sued the USDA

8   seeking a temporary restraining order and preliminary injunction preventing the USDA from

9   implementing the FLS Suspension Notice.  (Compl. at ¶ 57); *see also United Farm Workers v.*

10  *Perdue*, No. 1:20-cv-1452-DAD-JLT, 2020 WL 6318432 (E.D. Cal. Oct. 28, 2020).  In that case,

11  plaintiffs argued that the USDA's decision was arbitrary and capricious—largely because it failed

12  to consider the DOL's reliance on the FLS data—and that it failed to comply with the APA's

13  notice-and-comment requirements.  (Compl. at ¶ 57.)  Plaintiffs also argued that H-2A foreign

14  guestworkers and U.S. farmworkers would be irreparably harmed if FLS data from 2020 and the

15  November 2020 FLR were not available for the DOL to use in establishing the 2021 AEWRs.

16  (*Id.*)  On October 28, 2020, this court granted plaintiffs' motion and enjoined the USDA from

17  canceling the October 2020 FLS and ceasing publication of the November 2020 FLR.  (*Id.* at

18  ¶ 58); *see also Perdue*, 2020 WL 6318432.

19       On November 5, 2020, the DOL published a final rule in the Federal Register announcing

20  changes to its methodology for setting AEWRs under the H-2A program.  (Compl. at ¶ 4); *see*

21  *also Adverse Effect Wage Rate Methodology for the Temporary Employment of H-2A*

22  *Nonimmigrants in Non-Range Occupations in the United States*, 85 Fed. Reg. 70,445 (Nov. 5,

23  2020) ("the Final Rule").  The Final Rule became effective on December 21, 2020.  (Compl. at

24  ¶ 4.)  In that Final Rule, the DOL elected to freeze the current 2020 AEWRs for two years.  (*Id.* at

25  ¶ 61.)  The 2020 AEWRs are based on FLS data reflecting what farmworkers were paid in 2019.

26  (*Id.*)  The Final Rule maintains these 2019 wage rates as the AEWRs for most agricultural jobs in

27  2021 and 2022.  (*Id.*)  Then, beginning in 2023, the DOL would adjust the AEWRs annually

28  using the Employment Cost Index ("ECI")—an index that measures the change in the cost of

1  labor by surveying various private industries, but notably excluding farms and agricultural

2  workers.  (*Id.*)  Under the Final Rule, the DOL will also establish AEWRs each year—including

3  in 2021 and 2022—for a smaller set of "higher-skilled" agricultural jobs using the annual

4  statewide average hourly gross wage for the occupation based on the OES survey—a program

5  administered by the DOL's Bureau of Labor Statistics that excludes farms from its data

6  collection.  (*Id.*)

7        On November 30, 2020, plaintiffs filed their complaint against defendants in this action

8  seeking declaratory and injunctive relief and asserting the following three claims:  (1) a violation

9  of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because the Final Rule

10  contravenes the governing statute; (2) a violation of the APA, 5 U.S.C. § 706, because the Final

11  Rule lacks adequate justification and analysis of the economic effects it will have on U.S.

12  workers; and (3) a violation of the APA, 5 U.S.C. § 553, because defendants failed to comply

13  with the requirements of notice-and-comment rulemaking in promulgating the Final Rule.

14  (Compl. at 37–39.)  Plaintiffs filed the pending motion for a preliminary injunction on November

15  30, 2020.  (Doc. No. 5.)  On December 7, 2020, defendants filed their opposition to plaintiffs'

16  motion, and plaintiffs replied thereto on December 11, 2020.  (Doc. Nos. 31, 34.)  The California

17  Attorney General's Office filed an *amicus curiae* brief on behalf of the State of California in

18  support of plaintiffs' pending motion for a preliminary injunction on December 9, 2020.[1]  (Doc.

19  No. 32-1.)

20                    **LEGAL STANDARD**

21        "The proper legal standard for preliminary injunctive relief requires a party to demonstrate

22  'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

23  absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

24  is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting

25  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v.*

26  *Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that

27

---

[1]  The court granted the State of California's motion for leave to file its *amicus curiae* brief on

28  December 10, 2020.  (Doc. No. 33.)

1  irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'")

2  (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).  The Ninth

3  Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that

4  serious questions going to the merits were raised and the balance of hardships tips sharply in the

5  plaintiff's favor."  *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*,

6  537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds by Winter*, 555 U.S. 7.[2]

7  The party seeking the injunction bears the burden of proving these elements.  *See Klein v. City of*

8  *San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *Caribbean Marine Servs. Co. v. Baldrige*,

9  844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm

10  sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a

11  prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy

12  that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

13  *Winter*, 555 U.S. at 22.

## ANALYSIS

15      Here, plaintiffs allege various violations of the APA and seek a preliminary injunction (1)

16  preventing the DOL from implementing the regulatory changes announced in its Final Rule

17  published on November 5, 2020, and (2) ordering the DOL to issue AEWRs.  (Doc. No. 5 at 33.)

18      "The APA sets forth the procedures by which federal agencies are accountable to the

19  public and their actions subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of*

20  *the Univ. of California*, __U.S.__, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks and

21  citation omitted).  Only "final agency actions" are reviewable under the APA.  5 U.S.C. § 704;

22  *see also* 5 U.S.C. § 701 (for purposes of the APA's judicial review provisions, "agency action"

23  has "the meaning[] given" by § 551).  An "'agency action' includes the whole or a part of an

24  agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

---

25  [2]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale
26  approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild*
    *Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of
27  hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,
    so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
28  injunction is in the public interest."  *Id.* at 1135.

5 U.S.C. § 551(13).  Under § 706 of the APA, the court is "to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Regents*, 140 S. Ct. at 1905 (internal quotation marks and citation omitted).

The APA "requires agencies to engage in reasoned decisionmaking, and directs that agency actions be set aside if they are arbitrary or capricious." *Regents*, 140 S. Ct. at 1905 (internal citations and quotation marks omitted).  An agency's "determination in an area involving a 'high level of technical expertise'" is to be afforded deference. *McNair*, 537 F.3d at 993 (citing 5 U.S.C. § 706(2)(A)).  The district court's role "is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Id.* (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  "Factual determinations must be supported by substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection between facts found and conclusions made.'" *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations omitted).

> This requires the court to ensure that the agency has not, for instance, "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*McNair*, 537 F.3d at 987 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As noted, plaintiffs must make a sufficient showing as to all four prongs of the *Winter* test in order to be entitled to the requested preliminary relief.  *All. for the Wild Rockies*, 632 F.3d at 1135.  The court will begin its analysis by considering plaintiffs' likelihood of success on their claims.

## A.    Likelihood of Success on the Merits

Plaintiffs bear the burden of demonstrating that they are likely to succeed on the merits of this action or, at the very least, that "serious questions going to the merits were raised." *All. for the Wild Rockies*, 632 F.3d at 1131.

8

1.   Whether the Final Rule is Arbitrary and Capricious Because It Contravenes
Federal Law by Failing to Protect United States Workers Against Adverse Effects

In their first claim, plaintiffs allege that the Final Rule is arbitrary and capricious because it contravenes the INA's mandate that the DOL ensure that the hiring of temporary foreign guestworkers "will not adversely affect the wages and working conditions of workers in the United States similarly employed."  (Compl. at ¶¶ 99–103.)

"Agencies cannot exceed the scope of their authority as circumscribed by Congress." *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020).  Under § 706(2)(A) of the APA, regulations that contravene federal law or that are "'contrary to clear congressional intent'" must be declared invalid and set aside.  *Id.*  "When reviewing an agency's statutory interpretation under the APA's 'not in accordance with law' standard," the court must "adhere to the familiar two-step test of *Chevron*." *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008).  At *Chevron* step one, "if Congress 'has directly spoken to the precise question at issue . . . the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1149 (9th Cir. 2015) (quoting *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 (1984)).  If the court determines that the statute is ambiguous with respect to the precise question at issue, and Congress therefore left a gap for the agency to fill, the court must proceed to *Chevron* step two and ask "whether the agency's answer is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467 U.S. at 843).  While the standard of review at *Chevron* step two is highly deferential to the agency determination, *id.*, the analysis is the same test applied to agency changes in policy:  that is, "[a] permissible construction is one that is not 'arbitrary, capricious, or manifestly contrary to the statute.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019), *cert. denied*, No. 19-1009, 2020 WL 3405861 (U.S. June 22, 2020).

Here, the court finds that plaintiffs have demonstrated a likelihood of success on the merits of this claim.  The undersigned finds the decision in *American Federation of Labor & Congress of Industrial Organizations (AFL-CIO) v. Brock*, 835 F.2d 912 (D.C. Cir. 1987) to be

instructive under the circumstances presented here.  There, the plaintiffs challenged the DOL's new methodology for computing the AEWRs as both contrary to congressional intent and arbitrary and capricious.  *Id.* at 914.  Over the preceding twenty years, the DOL had periodically increased the AEWRs to compensate for past adverse wage effects.  *Id.*  Based on the assumption that farm wages had stagnated due to the influx of foreign guestworkers, the DOL had linked AEWRs to manufacturing wages and enhanced those wages by a USDA data-based index, producing AEWRs that exceeded farm wages by approximately 20 percent.  *Id.*  In 1987, the DOL issued a new methodology that set AEWRs for all states equal to the average hourly agricultural wages paid the prior year.  *Id.*  Because farmworkers faced possible wage cuts under the new rule, plaintiffs challenged it.  *Id.*

After the district court invalidated the new rule, the D.C. Circuit reversed.  The court first determined that

> Congress, indeed, has never paid any attention to the method or policy of calculating AEWRs.  . . . [C]alculating AEWRs has been left entirely to the Department's discretion.  The committee and floor discussion on the IRCA, cited by both parties, confirms only Congress' general intent to protect United States workers against adverse effects from imported labor.

*Id.* at 915.  At *Chevron* step two, however, the court found that the new AEWR rule was not a permissible construction of the statute.  *Id.* at 917–19.  "Because the Department ma[de] no *explanatory* attempt to 'forthrightly distinguish or outrightly reject' [its] contradictory precedent, [the court] and the public [we]re 'left with no guideposts for determining the consistency of administrative action . . . or for accurately predicting future action' by the agency."  *Id.* at 918.  In discounting the DOL's arguments that its previous AEWR methodology caused wage rate anomalies and was difficult to calculate, the court stated that

> [i]f [the DOL] is saying that there is no wage depression from past foreign workers, it must make that case forthrightly.  Inability to secure persuasive data as to any effects of past wage depression might indeed justify ending the enhancement or contribute to such a decision.  But the example given by the Department could just as logically suggest that adjustments were needed, but in an upward direction rather than a total elimination.  The Department simply does not explain why such variances justify the Department's total abandonment of its policy of enhancing AEWRs to compensate for

10

1
2
3

> past wage depressions rather than changes in methodology to assure
> more accurate estimates.  Thus, even if the Department does have a
> case for changing its premises about adverse wage effects on
> American workers, that case has yet to be made.

4   *Id.* at 919.

5        As an initial matter, the court agrees with the D.C. Circuit's reasoning expressed in the

6   *Brock* decision as it relates to *Chevron* step one.  Defendants assert in this case, and the court

7   agrees, that the INA does not prescribe the methodology for calculating the AEWR—or even

8   require that the DOL set an AEWR—but instead broadly delegates to the DOL the responsibility

9   to craft a mechanism to certify that hiring H-2A workers "will not adversely affect the wages of

10  workers in the United States similarly employed."  (*See* Doc. No. 31 at 19) (quoting 8 U.S.C. §

11  1188(a)(1)(B)); *United Farm Workers v. Solis*, 697 F. Supp. 2d 5, 9 (D.D.C. 2010) (rejecting a

12  challenge to the DOL's 2008 AEWR rule and stating "Congress did not . . . define adverse effect

13  and left it in the [DOL's] discretion how to ensure that the importation of farmworkers met the

14  statutory requirements").

15       Accordingly, the court must move to the second question under *Chevron*:  whether the

16  DOL's Final Rule is a permissible construction of the INA.  The gravamen of plaintiffs' claim in

17  this case is that the Final Rule's determination to permit employers to pay guestworkers below

18  market wage rates is contrary to Congress's clear intent because the wages of U.S. farmworkers

19  will decline or stagnate in response.  (Doc. No. 5 at 15–17.)  Plaintiffs note that the DOL has

20  historically recognized that while admitting H-2A workers can address a labor shortage, "[a]bsent

21  an increase of workers under the H-2A program, wages would rise above the currently observed

22  wage in order to dispel the labor shortage."  (Doc. No. 5 at 15) (quoting 75 Fed. Reg. at 6,891).

23  Indeed, the DOL's 2010 Rule explained that AEWRs guard against wage stagnation "[b]y

24  computing an AEWR to approximate the equilibrium wage that would result absent an influx of

25  temporary foreign workers, . . . put[ting] incumbent farm workers in the position they would have

26  been in but for the H-2A program."  (Doc. No. 5 at 15) (quoting 75 Fed. Reg at 6,891–92).  That

27  approach, the DOL explained, "avoids adverse effects on currently employed workers by

28  /////

11

1   preventing wages from stagnating at the local prevailing wage rate when they would have

2   otherwise risen to a higher equilibrium level over time." (*Id.*) (quoting 75 Fed. Reg at 6,891–92).

3   According to plaintiffs, the Final Rule reaffirms this reasoning while nonetheless adopting

4   a completely contrary policy. As plaintiffs characterize it, the Final Rule severs the relationship

5   between the AEWR and current farm labor market conditions; freezes the AEWRs for two years

6   at 2020 levels, even though recent trends establish that agricultural wages have been rising and

7   will likely continue to do so; then lifts the wage freeze in 2023 based on the ECI, a generic index

8   of wages from across the economy, without ever compensating for the wage growth lost during

9   the two-year wage freeze. (Doc. No. 5 at 16.) At the hearing on the pending motion, plaintiffs

10   explained that the historical trend of the FLS data conclusively shows that the Final Rule will

11   result in reduced wages. The May 2020 FLS data also indicates that the AEWRs are increasing

12   as they have been over the last number of years and doing so at a faster rate than the general wage

13   index. (*See* Doc. No. 5-3.) Plaintiffs also note that employers' complaints about increasing H-2A

14   wages reflect that AEWRs were expected to be higher in 2021 than in 2020. (Doc. No. 5 at 21.)

15   Thus, plaintiffs aver that even AEWRs based upon the May 2020 FLS data would be higher than

16   AEWRs based on 2019 data. Moreover, plaintiffs argue that the ECI's lack of farm labor data is

17   particularly significant because agricultural wages have been rising faster than average wages

18   across the economy. (Doc. No. 5 at 16) (quoting 85 Fed. Reg. at 70,455). Further, because the

19   ECI reflects national trends, not state-wide markets, the new methodology under the Final Rule

20   does not track local labor market conditions. (*Id.* at 17.)

21   Defendants counter that the Final Rule "strikes a reasonable balance" between "providing

22   employers with an adequate legal supply of agricultural labor while protecting the wages and

23   working conditions of" U.S. workers. (Doc. No. 31 at 20) (quoting 85 Fed. Reg. at 70,453). At

24   the hearing on the pending motion, plaintiffs characterized that balance as a clear attempt to

25   protect employers, an objective not contemplated by the INA. The court notes, however, that

26   defendants are obligated to "serve the interests of both farmworkers and growers—which are

27   often in tension," and "[t]hat is why Congress left it to the DOL's judgment and expertise to

28   strike the balance." *See Am. Fed'n of Labor & Cong. of Indus. Organizations (AFL-CIO) v.*

12

1   *Dole*, 923 F.2d 182, 187 (D.C. Cir. 1991).  Defendants contend that they strike that balance by

2   disaggregating the wage rate paid to farmworkers of different occupational categories.  (Doc. No.

3   31 at 20.)  Defendants posit that the new methodology provides significant wage increases for

4   highly skilled workers, pointing to a chart attached to their opposition brief demonstrating that

5   wages for construction laborers, first-line supervisors of farm workers, and heavy trucking/truck

6   drivers will increase significantly under the Final Rule in comparison to the methodology to be

7   employed under the 2010 Rule.[3]  (Doc. No. 31-1 at ¶12) (citing 85 Fed. Reg. at 70,458–59).  As

8   for field and livestock workers, defendants discount plaintiffs' assertion that farmworkers' wages

9   will decline or stagnate, noting that the ECI has never gone down year-over-year, whereas the

10  FLS has.  (Doc. No. 31 at 21) (citing Doc. No. 31-3).  Defendants emphasize that wages will be

11  frozen and not decline for the next two years and are expected to only increase after that.

12      In the end, the court finds defendants' arguments to be unpersuasive.  "[T]he requirement

13  that an agency provide reasoned explanation for its action would ordinarily demand that it display

14  awareness that it is changing position."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502,

15  515–16 (2009).  The agency "must show that there are good reasons for the new policy," but it

16  need not always show "to a court's satisfaction that the reasons for the new policy are better than

17  the reasons for the old one."  *Id.*  It does have to make such a showing, however, "[w]hen the new

18  policy rests upon factual findings that contradict those which underlay its prior policy; or when its

19  prior policy has engendered serious reliance interests that must be taken into account."  *Id.*

20      Here, defendants have failed to "'forthrightly distinguish[] or outrightly reject[]' [the]

21  contradictory precedent" as required since the Final Rule departs from accurate livestock and

22  fieldworker market wage data and intentionally depresses and stagnates the wages of those

23  workers.  *Brock*, 835 F.2d at 918.  While the DOL "is obliged to balance the competing goals of

24  the statute—providing an adequate labor supply and protecting the jobs of domestic workers"—

25  that balance must be supported by at least adequate reasoning.  *Dole*, 923 F.2d at 187.  In the

26  ───────────────

27  [3]  Attached to defendants' opposition brief is the declaration of Brian Pasternak, the current
Administrator of the Office of Foreign Labor Certification, Employment and Training

28  Administration ("OFLC") at the DOL.  (Doc. No. 31-1 at ¶ 1.)  The Pasternak Declaration
appends the referenced chart.  (*Id.* at ¶ 12; *see also id.* at 5.)

1  2010 Rule, the DOL recognized that lower-skill workers are most likely to suffer adverse wage

2  effects.  75 Fed. Reg. at 6,894  ("Additional research not previously considered suggests that any

3  adverse wage effects would be more likely to affect lower-skill workers.").  The DOL explicitly

4  "consider[ed] the forward-looking need to protect U.S. workers whose low skills make them

5  particularly vulnerable to even relatively mild—and thus very difficult to capture empirically–

6  wage stagnation or deflation that has the potential to result from the hiring of immigrant labor."

7  *Id.* at 6,893.  The current Final Rule also explicitly recognizes that the lower-skill work, which is

8  field and livestock work, make up most H-2A job opportunities.  85 Fed. Reg. at 70,461 ("[T]he

9  overwhelming majority of H-2A job opportunities . . . fall within the FLS field and livestock

10  workers (combined) category.").

11        Yet the Final Rule skirts analyzing its impact on those U.S. workers who make up most of

12  the target demographic that the INA mandates the DOL to protect.  The Final Rule both

13  "acknowledges the concerns of some commenters that fluctuating wages can be harmful to

14  workers, and their concerns that changes to the methodology could result in stagnating or

15  decreasing wages for farmworkers," and it "recognizes the possibility that the revised

16  methodology in this final rule may result in the AEWRs for field workers and livestock workers

17  being set at slightly lower levels in future years than would be the case under the [2010 Rule's]

18  methodology."  85 Fed. Reg. 70,453.  The Final Rule frames its new methodology as "more

19  accurately calculat[ing] than before the wages of certain more highly skilled farmworkers, for

20  which the Department has reason to believe the AEWRs have artificially depressed wages."  *Id.* at

21  70,454.  Indeed, the DOL justifies the Final Rule's methodology by expressing the concern that

22  the 2010 Rule's methodology "may have an adverse effect on the wages of workers in higher paid

23  agricultural occupations . . . whose wages may be inappropriately lowered by an AEWR

24  established from the wages of field and livestock workers (combined), an occupational category

25  from the FLS that does not include those supervisory workers."  *Id.* at 70,470.  While defendants

26  choose to characterize this as "striking a reasonable balance," the court finds that this analysis

27  most certainly tips heavily to one side.  It does so despite the fact that defendants are required to

28  protect against adverse effects on workers generally.  Where, as here, the DOL has historically

1   acknowledged that most adverse wage effects impact field and livestock workers, the agency is

2   required to justify a Final Rule that predominantly benefits higher-skilled workers' wages while

3   "slightly lower[ing] wages" for field and livestock workers.  However, the Final Rule fails even

4   to "display awareness that it is changing position" by intentionally deviating from the most

5   accurate data on field and livestock worker market wages.  *See Fox Television Stations, Inc.*, 556

6   U.S. at 515–16.

7        For these reasons, and for reasons explained in further detail below, the court is persuaded

8   that plaintiffs have established that they are likely to prevail on their claim that the Final Rule is

9   arbitrary and capricious because it is unsupported by and lacks adequate reasoning.  At the very

10   least, there can be no doubt that plaintiffs have raised serious questions about the *Chevron* step

11   two analysis:  whether the Final Rule is a permissible construction of the INA.

12        2.   Whether the Final Rule is Arbitrary and Capricious Because the DOL Failed to
13             Offer a Reasoned Explanation in the Final Rule

14        In their second claim, plaintiffs allege that the DOL has failed to offer a reasoned

15   explanation in the Final Rule, and thus the Final Rule is arbitrary and capricious.  (Doc. No. 5 at

16   17–25.)  It is "a fundamental requirement of administrative law . . . that an agency set forth its

17   reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency

18   action."  *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).  "[C]onclusory

19   statements will not do; an agency's statement must be one of reasoning."  *Id.* (internal quotation

20   marks omitted); *see also Dep't of Commerce*, 139 S. Ct. at 2569 (an agency must "articulate[] a

21   satisfactory explanation for [its] decision").

22        Here, plaintiffs assert that the DOL's Final Rule failed to offer a reasoned explanation

23   with respect to three obvious issues:  (1) justification for its imposition of a two-year wage freeze;

24   (2) the adoption of a generic wage index to adjust AEWRs starting in 2023, contradicting the

25   Final Rule's emphasis elsewhere regarding the need to rely upon accurate data on agricultural

26   labor markets; and (3) its failure to analyze the economic effects of the new AEWR methodology

27   on U.S. workers.  (Compl. at ¶¶ 104–10.)  The court will consider each argument in turn.

28   /////

15

1

2

a.   *Whether the DOL Explained Its Decision to Freeze H-2A Wages for Two Years*

3

4

5

6

7

8

9

10

11

Plaintiffs argue that the Final Rule arbitrarily freezes H-2A wages for two years, stagnating wages in a manner wholly at odds with the AEWR's purpose and the DOL's statutory mandate.  (Doc. No. 5 at 18.)  They contend that the evidence, as described above, demonstrates that farmworkers' market wages are already above the level of the wage freeze.  (Doc. No. 5 at 21) (citing 85 Fed. Reg. at 70,456).  Plaintiffs also object to the Final Rule's characterization that the USDA's FLS Suspension Notice has created uncertainty about the FLS, noting that the Final Rule does not acknowledge that FLS data *will* be available because this court enjoined the application of the FLS Suspension Notice.[4]  (Doc. No. 5 at 18–19) (citing 85 Fed. Reg. at 70,446, 70,456); *see also Perdue*, 2020 WL 6318432.

12

13

14

15

16

17

18

19

20

21

In opposition, defendants assert that the predictability offered by the wage freeze followed by reliance on the ECI is beneficial for farmers and farmworkers alike.  (Doc. No. 31 at 23.)  In this regard, defendants reason that "[f]or farmers, large and unpredictable wage fluctuations make it harder to plan and 'ultimately discourage domestic agriculture production,' which harms U.S. farmworkers who depend on robust agricultural output in the United States."  (*Id.*) (citing 85 Fed. Reg. at 70,452.  Additionally, defendants explain "farmworkers can be assured that wages will not decline from one year to the next and that, beginning in 2023, they will steadily increase— from a starting point well above the minimum wage."  (*Id.* at 23–24.)  Defendants also contend that "[there is nothing contradictory about defending the rigor of the FLS and deciding its use is, on balance, not appropriate in this context."  (*Id.* at 25.)

22

23

24

25

26

27

28

---

[4]  In their opposition, defendants argue that the DOL did not act unreasonably in predicting that it was at least possible that new FLS data might not be available by the time the OFLC Administrator needed to publish new rates on December 31, 2020.  (Doc. No. 31 at 25.)  Defendants state that the Final Rule "acknowledged this Court's injunction requiring USDA to resume data collection and publication," but it remained concerned with the timing of those resumed efforts.  (*Id.*) (citing 85 Fed. Reg. at 70,446).  Defendants note that following this court's October 28, 2020 order granting a temporary restraining order and preliminary injunction, the USDA provided a declaration on November 16, 2020, stating that the FLR would not be prepared by the end of the year.  (*Id.*)  The court addresses these arguments further below in its consideration of irreparable harm.

1    "[T]he question before this court is not whether Labor adopted the best wage possible. It

2    is only whether Labor's selection . . . falls within the broad realm of reason, and whether Labor

3    sufficiently explained the basis for its judgment." *Hispanic Affairs Project v. Acosta*, 901 F.3d

4    378, 395 (D.C. Cir. 2018). Thus, defendants are correct that "the FLS data may be the best data

5    available concerning wages of livestock workers, but if a wage based on that data would

6    adversely affect U.S. workers, then the agency was within its broad authority not to use the FLS

7    data."[5]  (Doc. No. 31 at 25.)

8         Nonetheless, the court is persuaded at this stage of the litigation that the Final Rule fails to

9    justify freezing wages below market rate. In the 2010 Rule, the DOL stated that it was required

10   to ensure that U.S. "workers receive the greatest potential protection from adverse effects on their

11   wages and working conditions, including the adverse effect of being denied access to the

12   opportunity to earn a higher equilibrium wage that would have resulted as the market (perhaps

13   slowly) adjusted in the absence of the guest workers." 75 Fed. Reg. 6,893. Throughout the Final

14   Rule at issue here, the DOL notes the importance of the AEWR reflecting the market rate. *See* 85

15   Fed. Reg. at 70,461–62. For example, in rejecting certain proposals, the Final Rule states that

16   "[t]he AEWR is meant to approximate the wage paid to workers in the United States similarly

17   employed" and "a single national AEWR . . . that covers all occupations would not meet that

18   purpose" because it "would immediately and dramatically reduce the wages of both H-2A and

19   similarly employed workers, particularly those performing work in dozens of states currently

20   being paid a wage above the FY 2020 national AEWR based on the FLS"; and that, "'a single

21   national AEWR applicable to all agricultural jobs in all geographic locations would prove to be

22   below market rates in some areas and above market rates in other areas, resulting in all of the

23

24   ---

     [5]  Similarly, the court discounts plaintiffs' contention that that the DOL fails to explain why the
25   two-year wage freeze serves as a "transition period" needed to "provide[] employers with a
     reasonable amount of time to plan their labor needs and agricultural operations under the new
26   wage requirements." (Doc. No. 5 at 22) (quoting 85 Fed. Reg. at 70,467). Plaintiffs assert that
     the DOL could have best ensured continuity for employers and farmworkers alike by leaving the
27   existing methodology in place and using the FLS data that the USDA is enjoined to produce.
     (*Id.*) That argument is misplaced, since that decision falls within the DOL's broad discretion so
28   long as the decision made is sufficiently explained.

1    associated adverse effects that have been previously discussed.'" *Id.* at 70,461.  Elsewhere, the

2    Final Rule discounts a proposal that would "produce[] 'artificially lower [wages] to a point that

3    [they] no longer represent[ed] a market-based wage.'" *Id.* at 70,462.

4          Still, the Final Rule implements a methodology freezing wage rates that are already below

5    the current market rate.  Defendants skirt this issue by contending that the wage freeze ensures

6    that farmworkers' wages will not decrease and "will steadily rise 'with the changes in wages and

7    salaries in the broader economy,'—two beneficial features absent from the current AEWR

8    methodology."  (Doc. No. 31 at 23) (citing 85 Fed. Reg. at 70,454).  However, the closest that the

9    Final Rule gets to addressing the intentional departure from accurate market wages is its

10   statement that "even if more recent, 2020 FLS wage data were available, relying on it to set 2021

11   AEWRS would only serve to perpetuate the very wage volatility that the Department seeks to

12   ameliorate through this rule." 85 Fed. Reg. at 70,453.  First, the court agrees with plaintiffs that

13   the USDA's FLS Suspension Notice should not factor into this equation, at least with regard to

14   setting the 2021 AEWRs, because the undersigned enjoined that decision and 2020 FLS data

15   should therefore be available in a timely fashion.  Second, although it is a factor to be considered,

16   employers' concerns about an FLS-based AEWR methodology being "unpredictable" and

17   "volatile" is alone an insufficient justification for departing from the methodology.  Despite

18   claiming that it concluded "on balance" that use of the FLS was "not appropriate in this context"

19   (Doc. No. 31 at 25), the DOL has not in fact addressed the impact that freezing below-market

20   rates will have on field and livestock workers.  As explained above, the 2010 Rule focused on

21   protecting these lower-skilled workers—the vast majority of the very farmworkers the DOL is

22   charged with protecting—from adverse wage effects.  Here, the DOL has failed to justify the

23   Final Rule's shift to primarily benefiting a smaller group of higher-skilled workers.  *See Fox*

24   *Television Stations, Inc.*, 556 U.S. at 515–16.

25         Accordingly, plaintiffs have demonstrated that they are likely to prevail on their claim that

26   the Final Rule is arbitrary and capricious because defendants have failed to explain the decision to

27   freeze H-2A wages below market rate for two years.

28   /////

b.   *Whether the DOL Adequately Explained Its Decision to Use the ECI to Adjust AEWRs Starting In 2023*

Next, plaintiffs argue that the Final Rule is arbitrary and capricious because it fails to justify its decision to replace reliance on the FLS with a system of annual adjustments to the 2020 AEWRs using the ECI.  (Doc. No. 5 at 22–23.)  Plaintiffs assert that the Final Rule does not explain how a metric with no connection whatsoever to the farm labor market can adequately protects U.S. farmworkers from adverse effects.  (*Id.* at 23; *see also* Doc. No. 5-4, table 1 n.2).  According to plaintiffs, the DOL's decision to rely on the ECI is even more significant given that farmworker wages have been increasing faster than wages in the general economy.  (Doc. No. 5 at 23.)  Though the Final Rule states that reliance on the ECI would lead to "greater stability" for employers, nowhere does the Final Rule explain why ECI data is an economically valid proxy for agricultural labor market outcomes.  (*Id.*)  Pointing to the decision in *AFL-CIO v. Brock*, plaintiffs note that when the DOL previously used manufacturing wage rates to calculate the AEWR for agricultural guestworkers, the DOL recognized the mismatch and justified its decision as necessary to address adverse effects from temporary foreign labor.  (Doc. No. 5 at 23.)  Here, by contrast, the DOL celebrates its switch to reliance upon ECI data because it yields a "reduction in wage growth relative to the previous methodology," a goal at odds with the very purpose of the rule itself which is to prevent adverse effects on U.S. farmworkers' wages.  (*Id.*) (citing 85 Fed. Reg. at 70,456).

In opposition, defendants argue that the ECI "provides an accurate measure of annual increases in wages across the private sector and 'is particularly well suited as a vehicle to adjust wage rates to keep apace with what is paid by other employers.'"  (Doc. No. 31 at 27) (citing 85 Fed. Reg. at 70,455).  Similarly, the Final Rule states that the ECI-based adjustments to the AEWRs "will ensure field and livestock worker wages continue to rise apace with wages in the broader U.S. economy in a consistent and predictable manner."  (*Id.*) (citing 85 Fed. Reg. at 70,445).  According to defendants, "indexing the AEWRs to the ECI will produce steadily increasing AEWRs for field and livestock workers that fulfill the statutory requirement to prevent adverse effect on the wages of workers in the United States similarly employed, while providing

19

1    consistency and predictability to the agricultural economy."  (*Id.*) (citing 85 Fed. Reg. 70,445).  In

2    this same vein, the Final Rule notes that using the ECI provides programmatic consistency as it is

3    "the current means by which the monthly AEWR is adjusted for range occupations."  (*Id.*) (citing

4    85 Fed. Reg. 70,445).

5            The court is not persuaded that plaintiffs have met their burden with regards to this issue

6    in seeking preliminary injunctive relief.  The relevant section of the Final Rule thoroughly

7    explains why the DOL chose to rely on the ECI.  *See* 85 Fed. Reg. at 70,455.  The DOL's

8    decision, even if one "of less than ideal clarity," must be upheld because in making that choice

9    "the agency's path may reasonably be discerned."  *State Farm*, 463 U.S. at 43.  Unlike the

10   manufacturing wages-based methodology in *Brock*, here the Final Rule still relies on field and

11   livestock worker wage data—albeit, not current data—and *then* adjusts using the ECI because it

12   measures changes in wages.  The Final Rule explains that "[t]he FLS-based, ECI-adjusted AEWR

13   methodology in this final rule is, in the Department's judgment, the most effective available

14   methodology that addresses the oft-cited concern among many commenters that under the

15   proposed approach, AEWRs would be too unpredictable and based on a methodology that would

16   be too complex."  85 Fed. Reg at 70,456.  The Final Rule also addresses the concerns expressed

17   by commenters with the old methodology by emphasizing that "ECI-based adjustments are

18   straightforward to calculate and, based on the substantial historical data available, predictable."

19   *Id.*  Moreover, the Final Rule notes that the DOL already uses the ECI "to make AEWR

20   determinations for H-2A herding and livestock jobs on the range."  *Id.* at 70,455.

21           As previously stated, the court is not tasked with assessing whether the DOL "adopted the

22   best wage possible," but is only to determine whether the DOL "sufficiently explained the basis

23   for its judgment."  *Hispanic Affairs Project*, 901 F.3d at 395.  Here, the court finds the Final

24   Rule's use of the ECI to be sufficiently explained.  Thus, the court concludes that plaintiffs have

25   not demonstrated likelihood of success, or even presented serious questions, with respect to the

26   merits of this aspect of their claim.

27   /////

28   /////

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

c.      *Whether the DOL Analyzed Harm to U.S. Farmworkers*

Next, plaintiffs argue that the DOL failed to analyze the economic harm to U.S. farmworkers of its Final Rule.  (Doc. No. 5 at 24.)  Plaintiffs take issue with the Final Rule simply labeling those harms as "Unquantifiable Transfer Payments," accompanied by a bare assertion that the DOL lacks the data "about the number of [U.S.] workers in corresponding employment and their wage structure."  (*Id.*) (citing 85 Fed. Reg. at 70,472).  Plaintiffs contend that consideration of the central issue underlying DOL's rule—whether an AEWR methodology prevents adverse effects on U.S. farmworkers—requires more than merely conceding harm but asserting at the same time that it is "unquantifiable."  (*Id.*) (citing *NRDC v. Rauch*, 244 F. Supp. 3d 66, 71 (D.D.C. 2017)).

Notably, defendants have little to say in opposition to this contention.  Rather, defendants merely reiterate that while the DOL has access to the number of H-2A worker positions sought, the nature of the occupations, the applicable AEWR, and the location of the employers, the agency has no access to similar information for the number of farmworkers in "corresponding employment."  (Doc. No. 31 at 28) (citing 85 Fed. Reg. at 70,472).  Defendants also contend that plaintiffs have offered no suggestion as to how the DOL might go about performing this calculating.  (*Id.*)

In reply, plaintiffs note that "DOL's regulations *require* that H-2A program employers provide similar information for U.S. workers."  (Doc. No. 34 at 14.)  Plaintiffs point to 20 C.F.R. § 655.156(a)(2), which requires H-2A employers to prepare, sign, and date written recruitment reports that include "the name and contact information of each U.S. worker who applied or was referred to the job opportunity up to the date of the preparation of the recruitment report, and the disposition of each worker."  These reports "must be made available in the event of a post-certification audit or upon request by authorized representatives of the Secretary."  *Id.* § 655.156(b).

The court finds plaintiffs' arguments in this regard to be persuasive based on the present record.  The D.C. Circuit's opinion in *AFL-CIO v. Dole* is instructive.  After that court reversed and remanded the action considering the 1987 AEWR rule in *Brock*, the DOL published a new

21

1   final rule providing additional reasoning for its new methodology.  *Dole*, 932 F.2d at 185.

2   Plaintiffs challenged the new rule, arguing that the DOL "impermissibly abandoned its past

3   policy of adding an upward adjustment for past wage depression, merely because such adverse

4   effect cannot be precisely measured, rather than attempting to find another proxy for supposed

5   wage depression." *Id.* at 187.  The court found the arguments meritless, explaining why as

6   follows:

> Were we to require that DOL hew to its old methodology until it had
> conclusive data on which to base a change, we would lock the
> Department into its previous policy.  Instead, we are entitled to ask
> only that DOL demonstrate that the data is inconclusive and "identify
> the considerations it found persuasive in making its decision."
> Because the record clearly shows that the data on adverse effect is
> inconclusive, and the Department provided an ample explanation of
> the considerations it found persuasive, we reverse the district court
> and uphold the final rule.

12   *Id.* at 187–88.  Thus, despite a lack of precise measurements, the court in *Dole* upheld the rule

13   specifically because the DOL made a case for why that data was inconclusive.

14        Here, the DOL has not pointed anywhere in the administrative record where it has made a

15   similar showing in this instance.  Rather than providing data points or citing attempts to identify

16   relevant data, the DOL simply concludes that it "does not have sufficient information about the

17   number of workers in corresponding employment affected and their wage structure to reasonably

18   measure the wage transfer to or from these workers."  85 Fed. Reg. at 70,472.  This conclusion is

19   expressed despite the Final Rule's acknowledgement that "the overwhelming majority of H-2A

20   job opportunities . . . fall within the FLS field and livestock workers (combined) category."  85

21   Fed. Reg. at 70,461.  At the hearing on the pending motion, defense counsel pointed to the 2010

22   Rule, which stated that the DOL could not quantify with precision the "transfer of costs from

23   government entities to employers as a result of lower expenditures on unemployment insurance

24   benefit claims."  75 Fed. Reg. at 6,947.  This difficulty arose in part because of "uncertainty about

25   . . . the quantity of corresponding U.S. workers, . . . [and] the ranges of wages in the areas of

26   actual employment."  *Id.*  Defendants assert that this lack of data has been a long-standing

27   problem that sufficiently explains why the DOL did not quantify the transfer payment from non-

28   H-2A employees to employers under the Final Rule.  However, as defendants have conceded, the

22

1  2010 Rule's failure to attempt to provide data with respect to U.S. workers does not justify the

2  current Final Rule's failure to do so.  Additionally, the court is less concerned with the 2010

3  Rule's failure to quantify transfer payments from *government entities* to employers than it is with

4  the current Final Rule's failure to quantify transfer payments from *U.S. workers* to H-2A

5  employers.  This is because the latter shift is a significant aspect to consider in light of the INA's

6  mandate that the DOL protect U.S. workers from adverse effects on wage.  This is especially

7  important considering that the Final Rule concludes that "[t]he new AEWR methodology may

8  further encourage U.S. employers to use more H-2A workers for field and livestock work in the

9  absence of available U.S. workers."  85 Fed. Reg. at 70,472.

10       Although the court cannot require the DOL to suspend issuing a rule until the data is

11  conclusive, it is "entitled to ask [] that DOL demonstrate that the data is inconclusive and

12  'identify the considerations it found persuasive in making its decision.'"  *Dole*, 932 F.2d at 187.

13  The DOL has failed to do so in the Final Rule at issue here.  For these reasons, plaintiffs have

14  demonstrated a likelihood of success on the merits of this aspect of their claim.

15       3.    <u>Whether the Final Rule Violates the APA's Notice-and-Comment Requirement</u>

16       In their third claim, plaintiffs allege that the DOL's Final Rule should be vacated because

17  defendants did not abide by the requirements of notice-and-comment rulemaking before issuing

18  the Final Rule.  (Compl. at ¶¶ 111–18.)  Specifically, plaintiffs allege that the Final Rule diverges

19  materially from the NPRM published in the Federal Register on July 26, 2019, and thus the public

20  was denied sufficient notice regarding the Final Rule's contents as well as an adequate

21  opportunity to provide comments.  (*Id.* at ¶ 116.)

22       Under the APA, agency actions taken "without observance of procedure required by law"

23  must be set aside.  5 U.S.C. § 706(2)(D).  "The APA requires public notice and comment and a

24  thirty-day grace period before a proposed rule takes effect."  *E. Bay Sanctuary Covenant v.*

25  *Trump*, 950 F.3d 1242, 1277 (9th Cir. 2020) (citing 5 U.S.C. §§ 553(b)–(d)).  The agency is

26  required to publish a notice of proposed rulemaking in the Federal Register, and it must include

27  "either the terms or substance of the proposed rule or a description of the subjects and issues

28  involved."  5 U.S.C. § 553(b)(3).  This means that "the final rule the agency adopts must be a

1    'logical outgrowth' of the rule proposed.  The object, in short, is one of fair notice."  *Long Island*

2    *Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (internal citations and quotation marks

3    omitted).  As the Ninth Circuit has explained:

> [A] final regulation that varies from the proposal, even substantially, will be valid as long as it is in character with the original proposal and a logical outgrowth of the notice and comments.  In determining whether notice was adequate, we consider whether the complaining party should have anticipated that a particular requirement might be imposed.  The test is whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule.

9    *Envtl. Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 851 (9th Cir. 2003) (internal citation and

10   quotation marks omitted).  Moreover, "[a]gencies, are free—indeed, they are encouraged—to

11   modify proposed rules as a result of the comments they receive."  *Ne. Md. Waste Disposal Auth.*

12   *v. E.P.A.*, 358 F.3d 936, 951 (D.C. Cir. 2004).

13        In this case, plaintiffs argue that the NPRM failed to provide the public with adequate

14   notice that the DOL would untether AEWRs from market wages by freezing AEWRs for

15   two years and then relying on the ECI to make future adjustments.  (Doc. No. 5 at 26.)  Plaintiffs

16   note that the DOL would not have had any reason to address a potential freeze of AEWRs in its

17   NPRM because the USDA did not issue its FLS Suspension Notice until over a year after the

18   DOL issued its NPRM.  (*Id.*)  Additionally, plaintiffs argue that the NPRM never suggested that

19   FLS data was in anyway problematic, and indeed stated that "the FLS [w]ould continue to be the

20   basis for the AEWRs covering the vast majority of H-2A workers."  (*Id.*) (citing 84 Fed. Reg. at

21   36,182).  Plaintiffs also argue that the Final Rule's departure from agricultural labor market data

22   is not a logical outgrowth of the NPRM because "[t]he NPRM stressed the importance of

23   establishing AEWRs based on market wages, explaining that the AEWR protects U.S.

24   farmworkers from adverse effects because it is the wage rate that is determined from a survey of

25   actual wages paid by employers.'"  (*Id.* at 27) (citing 84 Fed. Reg. 36,179).

26        In opposition, defendants argue that the NPRM specifically referred to the ECI as an

27   alternative in the absence of FLS data and specifically asked the public to comment on its

28   possible future use.  (Doc. No. 31 at 17) (citing 84 Fed. Reg. at 36,182)  Defendants contend that

24

1    the NPRM asked whether the DOL "should consider any other methodology that would promote

2    consistency and reliability in wage rates from year to year," if FLS data could not be used to

3    produce a wage.  (Doc. No. 31 at 17) (citing 84 Fed. Reg at 36,182).  According to defendants,

4    the NPRM invited comment on "all aspects" of the AEWR methodology, including the "use of

5    the FLS and OES survey, the conditions under which each survey should be used to establish the

6    AEWR," and "any alternate wage sources the [DOL] might use to establish the AEWRs in the H-

7    2A program."  (*Id.*) (quoting 84 Fed. Reg. at 36,184).  Additionally, defendants argue that the

8    NPRM announced the DOL's intention to utilize more occupation-specific data and end its

9    exclusive reliance on the FLS.  (Doc. No. 31 at 16) (citing 84 Fed. Reg. at 36,179).  Defendants

10   also note that several worker advocacy organizations, including plaintiffs, cautioned against the

11   use of OES data mentioned in this aspect of the proposal, thus indicating that those organizations

12   were aware that the new methodology was a possibility.  (*Id.*) (citing 85 Fed. Reg. at 70,452).

13        In analyzing this issue, the undersigned finds the decision in *CSX Transportation, Inc. v.*

14   *Surface Transportation Board*, 584 F.3d 1076 (D.C. Cir. 2009) to be instructive.  Plaintiffs rely

15   on this case to support the assertion that this court should follow the lead of other "courts [that]

16   have previously invalidated rate-setting rules that made methodological changes never suggested

17   by the relevant NPRM."  (Doc. No. 5 at 27.)  In *CSX Transportation, Inc.*, railroad companies

18   asserted that the Surface Transportation Board violated notice-and-comment requirements

19   because it failed to give notice of a significant change to the methodology for resolving rail rate

20   disputes, which surfaced for the first time in the final rule.  *CSX Transp., Inc.*, 584 F.3d at 1078.

21   The railroads challenged the decision to depart from calculating rates based on four years' worth

22   of data to instead relying on only one year's–worth of data.  *Id.*  The D.C. Circuit found that while

23   "the final rule did not amount to a complete turnaround from the NPRM," the case was "far more

24   like those in which [the court] found that agencies had failed to give adequate notice."  *Id.* at

25   1081–82.  The court was not persuaded by the Board's contention "that the mere mention of the

26   release of one-year data for comparison groups gave notice that the amount of data available for

27   that purpose might change."  *Id.* at 1082.  The court also saw "no way that commenters here could

28   have anticipated which particular aspects of [the Board's] proposal [were] open for

25

consideration," and if the court "conclude[d] that commenters had notice merely because the NPRM mentioned one year's worth of data, the Board could issue broad NPRMs only to justify any final rule it might be able to devise by whimsically picking and choosing within the four corners of a lengthy notice." *Id.*

Similarly, the undersigned concludes that the plaintiffs in this case could not have anticipated that a complete departure from the FLS was "open for consideration," despite "the mere mention" that the USDA may at some point terminate the FLS. *See id.* The NPRM did note that the DOL "does not have direct control over the FLS, and that USDA could elect to terminate the survey at some point." 84 Fed. Reg. at 36,183. The NPRM "addressed such a possibility in this proposal by providing that the OES statewide average hourly wage for the Standard Occupational Classification ("SOC") will be used if the FLS does not produce an annual gross hourly wage for the occupational classification for a State or region." *Id.* The following paragraph also acknowledged "that USDA may make future adjustments to the FLS methodology," and the NPRM stated that "[i]f the Department decides to later adjust the AEWR calculation based on methodological changes by USDA, *the [DOL] will provide the public with notice and the opportunity to provide comment before adopting any changes*." *Id* (emphasis added). Thus, even where the DOL recognized that the FLS could at some point be terminated or changed, the NPRM explicitly stated that it had already provided an alternative solution and would offer an additional opportunity for the public to comment if the agency had to adjust the AEWR based on methodological changes to the FLS by the USDA. 84 Fed. Reg. at 36,183. This supports the conclusion that a fair reading of the notice conveyed that the DOL did not intend to invite comment on removing the FLS from the methodology, at least for the final rule arising from this NPRM.

Additionally, the court does not read the NPRM's reference to using the ECI in lieu of unavailable FLS data as suggesting any intention to completely supplant the FLS data with ECI and OES data. *See* 84 Fed. Reg. at 36,182 ("The Department requests comments on whether there are alternate methods or sources that it should use to set the AEWR in the event that the FLS does not produce a wage in an SOC and State or region . . . ."). The court concludes that this

aspect of the NPRM, fairly read, merely solicited suggestions on gap filling were the FLS to lack

relevant information.  This is especially true considering the NPRM's repeated references to the

FLS as the preferred source of data on livestock and fieldworker wage rates and its statement that

the DOL proposed to continue using the FLS despite lacking complete control over its

publication.  *See id.* at 36,183.  Given the overall context of this broad request for suggestions, the

court is not persuaded that the catchall request for comment on "any other methodology"

indicated that commenters should have known that a complete departure from the FLS "was 'on

the table.'"  *Nat. Res. Def. Council v. E.P.A.*, 279 F.3d 1180, 1188 (9th Cir. 2002).

At the hearing on the pending motion, defense counsel contended that the NPRM invited

comment on two scenarios in which FLS data might be unavailable:  (1) as quoted above, "in the

event that the FLS does not produce a wage in an SOC and State or region," 84 Fed. Reg. at

36,182; and (2) in the NPRM's subsequent paragraph, which states that "[a]s an alternative, the

[DOL] invites comments on whether to set AEWRs based on the current FLS occupational

classifications of field workers and livestock workers for each State or region."  *Id.* at 36,182–83.

But that paragraph also states that "the [DOL] generally prefers to establish AEWRs based on the

FLS rather than the OES survey because the FLS surveys farmers and ranchers, whereas the OES

surveys establishments that support farm production, as discussed below."  *Id.*  Thus, contrary to

defendants' position taken in opposition to the pending motion, this paragraph *also* indicates an

intention to continue using the FLS.

Plaintiffs have therefore shown that they are likely to prevail on their claim that the DOL

failed to comply with the notice-and-comment rulemaking requirements in issuing the Final Rule.

Accordingly, the court finds that plaintiffs have demonstrated a likelihood of success on the

merits of this claim.

### 3.    Irreparable Harm

Having found that plaintiffs have shown a likelihood of success on the merits of several

aspects of their claims, the court now turns to whether plaintiffs have also shown a likelihood that

they will suffer irreparable harm in the absence of the court granting preliminary injunctive relief.

The risk of irreparable harm must be "likely, not just possible."  *All. for the Wild Rockies*, 632

F.3d at 1131.  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  "[E]conomic hardship constitutes irreparable harm."  *Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003).  For low-income individuals, economic loss can mean inadequate access to "food, shelter [and] other necessities."  *Id.*; *cf. Paxton v. Sec'y of Health & Human Servs.*, 856 F.2d 1352, 1354 (9th Cir. 1988) ("When a family is living at subsistence level, the subtraction of any benefit can make a significant difference to its budget and to its ability to survive.").

Here, plaintiffs assert that their members, including both U.S. and H-2A farmworkers, will suffer material wage reductions under the new AEWR methodology adopted in the Final Rule. (Doc. No. 5 at 28–29.)  Plaintiffs point to the most recent FLS data as strongly suggesting that the California AEWR would have increased to approximately $15.58 in 2021.  (*Id.* at 29) (citing Doc. No. 5-3 at 6, 8).  Under the Final Rule, plaintiffs assert that those wages would be frozen at $14.77—the wage rate that farmworkers were paid in 2019.  (*Id.*) (citing Doc. No. 5-6 at 26). Most of plaintiffs' members working for H-2A employers are paid the AEWR, and thus those members working in California will be paid approximately $0.81 less per hour—totaling $139.32 per month and $1,393.20 over a ten-month farming season—absent a court order enjoining the DOL from implementing the Final Rule.  (*Id.*)  Plaintiffs contend that farmworkers in Oregon and Washington will experience similar losses, as most farmworkers working for H-2A employers in those states will be paid $77.40 less per month, totaling $774 in lost wages over a ten-month farming season, under the Final Rule.  (Doc. No. 5 at 29; *see also* Doc. No. 5-3 at 6, 8, 14, 16.)

Plaintiffs aver that these depressed wages will cause substantial economic hardship for many of their members.  (Doc. No. 5 at 29.)  According to the declarations of Teresa Romero, president of UFW, and Diana Tellefson Torres, executive director of UFW Foundation, farmworkers are among the lowest-paid workers in the United States, with many earning a subsistence income.  (Doc. Nos. 5-10 at ¶ 17; 5-11 at ¶ 6.)  Reducing farmworkers wages by approximately four or five percent would therefore clearly cause substantial harm to plaintiffs' members and their families.  (Doc. No. 5-10 at ¶¶ 11–16.)  Farmworkers who already struggle to

provide for the necessities of life will find that this wage depression will only place further financial strain on their ability to obtain food, shelter, and other necessities.  (Doc. No. 5 at 29.)  Many of plaintiffs' members, and other farmworkers across the United States, already struggle to pay for necessities such as shelter and medical care (*see* Doc. Nos. 5-10 at ¶ 18; 5-11 at ¶¶ 6–7), and many farmworkers suffer with food insecurity and must rely on emergency food programs (*see* Doc. Nos. 5-7 at 6 (finding that 49 percent of farmworkers fell into a state of food insecurity over a 2-year period); Doc. No. 5-11 at ¶ 6).  Plaintiffs contend that the DOL increases the risk that farmworkers will struggle to afford the cost of such necessities which, unlike their wages under the Final Rule, will not be frozen for the next two years.  (Doc. No. 5 at 30.)  According to plaintiffs, the economic impact of depressed wages on farmworkers will be exacerbated by the substantial increases in consumer prices over the last year.  (*See* Doc. Nos. 5-10 at ¶ 19; 5-8 (showing the cost of food increasing by 3.9 percent over the last twelve months.))  The cost of medical care has likewise increased by 4.1 percent between 2019 and 2020.  (*See* Doc. No. 5-9.)  Such harms threatened if the Final Rule is implemented are further exacerbated by reduced hours caused by the ongoing COVID-19 pandemic, leaving an already impoverished population even more vulnerable.  (*See* Doc. No. 5-11 at ¶ 8.)

Plaintiffs note that the Final Rule itself acknowledges that its methodology could result in employers hiring H-2A field and livestock workers at the expense of U.S. farmworkers, *see* 85 Fed. Reg. at 70,472, and that those lost job opportunities will cause substantial, incurable hardship for plaintiffs' members (*see* Doc. Nos. 5-10 at ¶ 26; 5-11 at ¶ 9).  Thus, according to plaintiffs, their U.S. farmworker members would also be irreparably harmed through the loss of their jobs.  (Doc. No. 5 at 29.)  As plaintiffs note, the "'loss of opportunity to pursue . . . chosen professions' constitutes irreparable harm," and "[t]he irreparable nature of [that] injury is heightened by [farmworkers'] fragile socioeconomic position."  (Doc. No. 5 at 30) (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)).  Plaintiffs argue that even if retroactive back pay could address any harm caused by the Final Rule, farmworkers would likely be unsuccessful in obtaining those back wages because (1) the H-2A certification process makes

/////

29

1   it difficult if not impossible to obtain retroactive pay, and (2) farmworkers face barriers to

2   accessing legal resources.  (*Id.* at 30–31) (citing Doc. No. 5-10 at ¶¶ 22–24).

3   In support of plaintiffs' motion, the State of California noted in its *amicus curiae* brief that

4   the state's farmworkers are essential and skilled labor that feeds the nation and boosts the

5   economy.  (Doc. No. 32-1 at 10.)  As the leading state for cash farm receipts and the nation's

6   largest agricultural global exporter, California emphasizes the magnitude of the harm that will

7   occur without the granting of the requested injunctive relief.  (*Id.* at 10–11.)  California notes that

8   given the lower wages in Mexico, where the vast majority of H-2A workers originate, the Final

9   Rule's two-year freeze on wages and the subsequent limit on the AEWR's rate of increase will

10  not discourage H-2A workers from taking U.S. agricultural jobs, which will further depress

11  domestic farmworker wages.  (*Id.* at 17.)  California also highlights the issues that are intertwined

12  with farmworker poverty, notably that:  the Final Rule will intensify the challenges farmworkers

13  already face in obtaining affordable housing and increase demand on state housing programs (*id.*

14  at 18–19); farmworkers' children will be more educationally disadvantaged, experience food

15  insecurity, and suffer poorer health, placing additional demands on state programs (*id.* at 19–22);

16  and farmworkers, who already suffer from inadequate health care, will suffer poorer health (*id.* at

17  22–24).  Finally, California avers that the increase in the vulnerable H-2A workforce—many of

18  whom fear speaking out against poor working conditions, face language barriers, and fear

19  retaliation—will seriously undermine the state's ability to enforce its labor protection laws.  (*Id.*

20  at 25–27.)

21  In their opposition to the pending motion, defendants argue that the granting of the

22  requested injunction is actually likely to *cause* irreparable harm to farmworkers, at least if it is

23  issued in the next few weeks.  (Doc. No. 31 at 28.)  In this regard, according to defendants,

24  plaintiffs have not demonstrated that "the requested relief is necessary to avoid irreparable harm

25  *during the interim period* that the relief is to be provided."  (*Id.* at 29) (quoting *S. Yuba River*

26  *Citizens League v. Nat'l Marine Fisheries Serv.*, No. 2:13-cv-00042-MCE, 2013 WL 4094777, at

27  *7 (E.D. Cal. Aug. 13, 2013) (emphasis in original)).  Defendants contend that under the Final

28  Rule, the AEWRs will be set at the same rate as the 2020 AEWRs for most farmworkers (*e.g.*,

1    field and livestock workers), but the AEWRs will increase for higher-skilled workers.  (*Id.*)

2    According to the Pasternak Declaration, under the Final Rule truck drivers will actually see wage

3    gains of approximately 75 to 120 percent in each of the top 25 states using the H-2A Program (or

4    a $8.82 to $13.87 increase in their hourly rates); supervisors in these states will see increases of

5    85 to 150 percent or more (a $10.02 to $18.34 increase in their hourly rates); and construction

6    laborers will similarly see significant wage gains.  (*Id.*) (citing Doc. No. 31-1 at ¶ 12).

7           Defendants also assert that if implementation of the Final Rule *is* enjoined, the AEWRs

8    for all workers will be the same as the 2020 AEWRs, or worse, the DOL may have to operate the

9    H-2A program without an AEWR at all.  (*Id.* at 29–30.)  Defendants note that the DOL's

10   regulations require the agency to publish "at least once in each calendar year . . . the AEWRs for

11   each State as a notice in the Federal Register," and AEWRs have not yet been published this year

12   and must be published by December 31, 2020.  (*Id.* at 30.) (citing 20 C.F.R. § 655.120(c)).

13   Current regulations also require the DOL to set the AEWRs using the "annual weighted average

14   hourly wage for field and livestock workers (combined) in the States or regions as published

15   annually by the U.S. Department of Agriculture based on its quarterly wage survey."  (*Id.*) (citing

16   20 C.F.R. § 655.103(b)).  They also observe that because no annual FLS data will be published

17   until the next FLR is published pursuant to the court's October 28, 2020 order in *United Farm*

18   *Workers v. Perdue*, No. 1:20-cv-1452-DAD-JLT, the most recent annual data is the 2019 FLR,

19   which is the data source used to set the 2020 AEWRs.  (*Id.*)  Defendants contend that the DOL

20   will have to take one of two actions if the Final Rule is enjoined:  (1) the DOL will either set the

21   2021 AEWRs using the 2020 rates, or, if that is not possible given DOL's current regulations, (2)

22   the DOL will be forced to assess operating the H-2A program without an AEWR, lowering the

23   wage floor established in the 2020 AEWRs to the federal or state minimum wages in the absence

24   of a CBA wage or a prevailing wage survey for all workers.  (*Id.*)  According to defendants, the

25   former scenario would keep most farmworkers in the same position as if the injunction did not

26   issue and would place some workers in a worse position; the latter scenario would bring harm to

27   nearly all farmworkers.  (*Id.*)  In this way, defendants assert that the granting of the requested

28   injunction would cause harm to at least some farmworkers.  (*Id.*)

1    Plaintiffs note that defendants do not dispute that thousands of plaintiffs' members and

2    farmworkers across the country would be paid substantially less under the Final Rule compared to

3    the 2010 Rule's methodology and instead are merely arguing that the court cannot grant effective

4    relief because FLS data is not yet available. (Doc. No. 34 at 16–17.) Plaintiffs urge this court not

5    to permit the DOL to use the USDA's delay in complying with the court's order to justify

6    allowing the DOL's Final Rule to become effective, since this was the very scenario that the

7    court's October 28, 2020 order granting preliminary relief in *Perdue* sought to avoid. (*Id.* at 17.)

8    In light of the FLR publication timeline (*see* Doc. No. 34-7), plaintiffs propose that the DOL

9    should issue interim AEWRs that protect farmworkers' wages while simultaneously notifying

10   employers that updated AEWRs are expected in February of 2021 and that employers are

11   responsible for providing backpay to farmworkers for work those workers perform during the few

12   weeks the interim AEWRs are effective. (*Id.* at 18.) Plaintiffs also suggest that the DOL issue

13   interim AEWRs based on FLS data published in May 2020, which details the wages paid to

14   farmworkers in January and April 2020. (*Id.*)

15   As an initial matter, an unlawful agency action cannot be upheld merely because of a

16   predicament that the government itself has created. Defendants argue that "[p]laintiffs created

17   what they now assert is an urgent need for the Court's intervention" because they waited nearly

18   four weeks to file suit and now assert that their members will suffer irreparable harm if the court

19   does not provide immediate preliminary relief. (Doc. No. 31 at 31.) Defendants assert that this

20   rushed timeline is largely of plaintiffs' making and they should not be rewarded for their own

21   inaction, particularly since they had advance notice that publication of the Final Rule was

22   forthcoming. (*Id.*) (citing *Perdue*, 1:20-cv- 01452-DAD-JLT (Doc. No. 30)). Defendants point to

23   Local Rule 231(b), contending that "[b]ecause Plaintiffs 'could have sought relief by motion for

24   preliminary injunction at an earlier date without the necessity for seeking last-minute relief,' . . .

25   the Court should deny Plaintiffs' Motion here and defer ruling on the merits until the full

26   administrative record is before the Court." (Doc. No. 31 at 31.)

27   The court finds this argument to be unpersuasive because it fails to acknowledge that,

28   after this court enjoined the USDA's FLS suspension Notice on October 28, 2020, the USDA

1   filed a motion seeking to dissolve that order on November 5, 2020—the Final Rule's publication

2   date. *See United Farm Workers v. Perdue*, No. 1:20-cv-01452-DAD-JLT, 2020 WL 6939021

3   (E.D. Cal. Nov. 25, 2020).  Plaintiffs filed their opposition to that motion to dissolve on

4   November 11, 2020. *Id.* at *1.  On November 25, 2020, the court denied the USDA's motion to

5   dissolve because the Final Rule had not yet gone into effect, and thus no change in law had

6   occurred that warranted dissolving the temporary restraining order. *Id.* at *4.  The court also

7   noted in the order that the purpose of APA § 553(d)'s time lag of at least 30 days between a

8   substantive rule's publication and its effective date "is to 'afford persons affected a reasonable

9   time to prepare for the effective date of a rule or rules or to take any other action which the

10   issuance of the rules may prompt.'" *Id.*  The court underscored this purpose in acknowledging

11   that plaintiffs intended to challenge the Final Rule. *Id.* at *4 n.4.  A mere five days later, on

12   November 30, 2020, plaintiffs submitted their complaint and pending motion in this action.  (*See*

13   Doc. Nos. 1, 5.)  Thus, in this court's view the current situation is in fact one of the *government's*

14   own making—not plaintiffs.  In any event, the court does not find that the short time between

15   publication of the Final Rule and the filing of the complaint in this action constitutes a delay that

16   weighs in favor of denying injunctive relief, and this conclusion is supported by § 553(d)'s time

17   lag.  Moreover, defendants' reliance on the decision in *Lydo Enters. v. City of Las Vegas*, 745

18   F.2d 1211 (9th Cir. 1984) is misplaced, because the appellees in that action waited *five years*

19   before acting, not five days.

20          Furthermore, the court is persuaded by both plaintiffs' and the State of California's

21   arguments and finds that plaintiffs—and farmworkers beyond plaintiffs' members—will suffer

22   irreparable harm absent the granting of the requested injunctive relief.  As plaintiffs have noted,

23   defendants do little to dispute plaintiffs' arguments regarding irreparable harm.  As expressed at

24   the hearing on the motion, the court is also persuaded by plaintiffs' argument that any harm

25   suffered from issuing interim AEWRs governing the period from January 1, 2021 to the FLR's

26   publication in February 2021 pales in comparison to harm posed if the requested injunctive relief

27   is not granted.  Although defense counsel at the hearing noted that mandatory injunctions are

28   disfavored, no such mandatory injunction is being sought here.  Just as the court explained to the

USDA when it enjoined the FLS Suspension Notice, the court is not in this case directing the DOL "to take any additional action that it otherwise would not have undertaken." *Perdue*, 2020 WL 6318432, at *16. Rather, in granting injunctive relief in this case the court is merely preserving the status quo by prohibiting the DOL from implementing the Final Rule and instead ordering defendants to operate in accordance with the 2010 Rule, which was the last uncontested status of the AEWR calculation methodology. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'").

Contrary to defendants' assertion, the court sees only one clear path in this case:  the DOL is required by its current regulations to publish AEWRs for 2021. *See* 20 C.F.R. § 655.120. The court acknowledges that the current situation presents some difficulties for the DOL to overcome in satisfying that requirement. As defense counsel noted at the hearing, there is no indication that the May 2020 FLS data could be used to publish AEWRs for 2021 under the current governing regulations. But the defendants are the experts in this area, and the court will not substitute its judgment for theirs by crafting a solution to the predicament that the government and its agencies have created. *See Perdue*, 2020 WL 6939021, at *2 n.1 (acknowledging plaintiffs' suggestion that the court may hold the government in contempt for "intentionally, and without adequate [excuse], def[ying] a court order by" delaying compliance).

Moreover, there appear to be a number of appropriate solutions from which defendants may choose. Plaintiffs persuasively suggest that interim AEWRs could satisfy the DOL's requirements because the regulations require that the agency "publish, *at least once* in each calendar year, . . . the AEWRs for each State as a notice in the Federal Register." (*See* Doc. No. 34 at 18 n.17) (citing 20 C.F.R. § 655.120(c)). Moreover, the court can extend the DOL's deadline to equitably facilitate defendants' compliance with this order and the requirements of law. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008) ("The district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong, and we review the district court's choice of remedies within that scope for

34

abuse of discretion.") (internal quotation marks and citation omitted); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 686 F. Supp. 2d 1026, 1050–51 (E.D. Cal. 2009) (extending deadlines for the United States Fish and Wildlife Service to cure regulatory timeline issues created by remanding agency action); *accord Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) ("'The APA provides that a court may compel 'agency action unlawfully withheld or unreasonably delayed.' 5 U.S.C. § 706(1).").  Here, on November 16, 2020, the USDA indicated the FLR would be published approximately nine weeks from the date that the USDA's data collection reinstatement notice was published in the Federal Register.  *Perdue*, 1:20-cv- 01452- DAD-JLT (Doc. No. 40-1 at ¶¶ 8–10).  The USDA's reinstatement notice was published in the Federal Register on December 10, 2020.  *See Notice of Reinstatement of the Agricultural Labor Survey Previously Scheduled for October 2020*, 85 Fed. Reg. 79,463 (Dec. 10, 2020).  Thus, the FLR is expected to be published on or about February 11, 2021.  The court finds it reasonable to expect the DOL to set the 2021 AEWRs in compliance with this order and its regulations within thirty (30) days of the FLR's publication.  This roughly aligns with the original timeline for setting the AEWRs—"[t]he Farm Labor report was originally scheduled for publication on November 25, 2020," *Perdue*, 1:20-cv- 01452-DAD-JLT (Doc. No. 40-1 at ¶ 11), and the DOL would have set the AEWRs no later than December 31, 2020.

The status quo to be preserved by this preliminary injunction order is one in which the 2010 Rule governs.  Defendants will be required to operate under the requirements of the 2010 Rule pending further order of this court, except for the deadlines which have or are about to pass as a result of the government's actions.  The parties will be directed to meet and confer as to the setting of new deadlines in light of this order as well as the framework to apply during the brief period of early 2021 before the new 2021 AEWRs can be announced.

Accordingly, the court concludes that consideration of the *Winter* factor of irreparable harm weighs in favor of the granting of the requested injunctive relief.

### 4.    Balance of the Hardships

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," and "should pay particular regard for

35

1    the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S.

2    at 24.  "In assessing whether the plaintiffs have met this burden, the district court has a duty to

3    balance the interests of all parties and weigh the damage to each." *Stormans, Inc.*, 586 F.3d at

4    1138 (internal quotation marks and alteration omitted).  "Where the government is a party to a

5    case in which a preliminary injunction is sought, the balance of the equities and public interest

6    factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020)

7    (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  As one district

8    court has stated:

9
10   > There is generally no public interest in the perpetuation of unlawful
   > agency action.  To the contrary, there is a substantial public interest
   > in having governmental agencies abide by the federal laws that
   > govern their existence and operations.
11

12   *Washington v. DeVos*, No. 2:20-cv-1119-BJR, 2020 WL 5079038, at *10 (W.D. Wash. Aug. 21,

13   2020) (citing *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

14            Here, plaintiffs argue that the balance of the hardships weighs in favor of the granting of

15   the requested injunctive relief because the public interest is served by preventing the DOL from

16   contravening the INA, preventing the wages of U.S. farmworkers from being depressed, and

17   facilitating the effective administration of the H-2A foreign guestworker visa program.  (Doc. No.

18   5 at 32) (citing *Gerstein v. CIA*, No. 06-cv-4643, 2006 WL 3462659, at *5 (N.D. Cal. Nov. 29,

19   2006) (recognizing public interest is served by promoting Congress's "core purpose" in enacting

20   regulatory program)).  Plaintiffs also note that that the public interest is served by ensuring that

21   the DOL complies with the APA.  (Doc. No. 5 at 31–32.)  Plaintiffs add that the public interest

22   "in the 'efficient administration of the immigration laws,'" which includes the H-2A program, "is

23   'weighty.'"  (Doc. No. 5 at 32) (citing *E. Bay*, 950 F.3d at 1281).  Moreover, injunctive relief

24   would serve the public interest by preserving the status quo.  (*Id.*)  (citing *Doe #1 v. Trump*, 957

25   F.3d 1050, 1069 (9th Cir. 2020) (holding "the public interest favors preserving the status quo")).

26   Finally, those interests are particularly strong where an agency's practice has "for countless

27   decades" allowed the government to administer "a stable immigration system."  (*Id.*) (citing

28   *Trump*, 957 F.3d at 1068).

1    In opposition, defendants reiterate that issuing a preliminary injunction will cause

2  irreparable harm to some farmworkers without preventing harm to others.  (Doc. No. 31 at 30.)

3  Defendants note that during the comment process, other worker advocacy organizations

4  "commended" the DOL "for realizing the H-2A employers have increasingly utilized the H-2A

5  program for occupations that should be paid at higher wage rates than the historical AEWR

6  approach."  (*Id.* at 30–31) (citing Doc. No. 31-4 at 5).[6]  Defendants also assert that higher-skilled

7  farmworkers will be irreparably harmed if plaintiffs' motion is granted because they will not

8  benefit from higher OES wages, and the DOL may be forced to assess operating the H-2A

9  program without any AEWR, which would harm nearly all farmworkers.  (*Id.*)  Additionally,

10  defendants state that preventing the Final Rule from taking effect will create unnecessary

11  confusion for employers and farmworkers alike if multiple rates will be set for 2021.  (*Id.*)

12    Having considered the arguments of the parties, the court concludes that the balance of

13  hardships in this case tips in favor of the granting of injunctive relief.  Indeed, considered alone

14  "[t]he government's failure to comply with the APA—particularly given the strength of the

15  [plaintiffs'] procedural attack on the Rule—weighs in favor of granting injunctive relief."  *E. Bay*,

16  950 F.3d at 1281.  Even assuming that higher-skilled farmworkers will suffer a harm if the Final

17  Rule is enjoined and ultimately reinstated, and that setting multiple rates will be confusing for

18  employers and farmworkers, those hardships are marginal compared to the hardship that field and

19  livestock workers—who make up "the overwhelming majority of H-2A job opportunities," 85

20  Fed. Reg. at 70,461—will suffer if a likely unlawful rule is implemented.  This is particularly true

21  in light of the fact that these farmworkers will face barriers to obtaining any applicable back pay.

---

[6]  This comment letter—submitted by the general counsel of Justice at Work in Pennsylvania (formerly Friends of Farmworkers, Inc.) and their client Comite de Trabajadores Agricolcas—states in the subsequent paragraph that the "DOL has failed to recognize that its methodology should require the payment of the *highest* wage rate that can be determined based on available data as being paid to U.S. workers in the area of employment."  (Doc. No. 31-4 at 5.)  The commenter then states that "[w]here the OES occupational survey established an average wage rate for an occupational code that wage rate should be the basis for the Adverse Effect Wage Rate **unless** farm labor survey data or another valid data source establishes a higher **average** wage rate in the area of employment."  (*Id.* at 6.)  In sum, while some worker advocacy organizations may have supported the Final Rule, the position taken by the commenter cited by defendants is not itself completely aligned with the Final Rule.

1    Because of the hardships that the public will face if defendants are not prevented from

2    implementing the November 5, 2020 Final Rule amending the DOL's regulations governing the

3    AEWR calculation methodology, the court finds that the balance of the hardships in this case

4    weighs in favor of the granting of the injunctive relief requested by plaintiffs.

5    **5.      Federal Rule of Civil Procedure 65(c) Security Bond**

6    Finally, the court will waive Federal Rule of Civil Procedure 65(c)'s security bond

7    requirement.  That rule states that the court may issue a preliminary injunction "only if the

8    movant gives security in an amount that the court considers proper to pay the costs and damages

9    sustained by any party found to have been wrongfully enjoined or restrained."  The district court

10   has discretion "as to the amount of security required, *if any*" and "may dispense with the filing of

11   a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining

12   his or her conduct."  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal

13   quotation marks and citation omitted).

14   Here, the court finds requiring a security bond to be posted in this case not to be

15   warranted, particularly in light of the fact that plaintiffs have already posted a $1,000.00 bond in

16   *Perdue*.  *See Perdue*, 1:20-cv- 01452-DAD-JLT (Doc. Nos. 33, 35)).  Notably, defendants have

17   not requested a bond, the balance of the hardships weighs in favor of plaintiffs, and the granting

18   of injunctive relief is in the public interest.  The court therefore finds that requiring a security

19   bond is unwarranted under these circumstances.  *See E. Bay Sanctuary Covenant v. Trump*, 349 F.

20   Supp. 3d 838, 868–69 (N.D. Cal. 2018) (waiving a bond where defendants had not requested a

21   bond, the balance of the hardships weighed strongly in favor of plaintiffs, and there was a

22   significant public interest underling the action), *aff'd*, 950 F.3d 1242 (9th Cir. 2020), *and aff'd*,

23   950 F.3d 1242 (9th Cir. 2020).

24   /////

25   /////

26   /////

27   ////

28   ////

**CONCLUSION**

For the reasons set forth above,

1.     Plaintiffs' motion for a preliminary injunction (Doc. No. 5) is granted;

2.     The court orders that defendants shall be prevented from implementing the November 5, 2020 Final Rule amending the DOL's regulations governing the AEWR calculation methodology and are ordered to operate under the 2010 Rule as it pertains to calculating the AEWRs;

3.     The parties are ordered to meet and confer within fourteen (14) days to submit a proposed order that includes deadlines by which defendants will set the 2021 AEWRs in accordance with this order and other legal requirements; and

4.     No bond will be required to be posted by plaintiffs pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

Dated:   **December 23, 2020**          _____

                                       UNITED STATES DISTRICT JUDGE